# FOR PUBLICATION

ATTORNEY FOR APPELLANT B.A.:

**PAMELA SIDDONS**
Siddons Law Office LLC
Mooresville, Indiana

ATTORNEY FOR APPELLANT J.A.:

**GLEN E. KOCH II**
Boren, Oliver & Coffey, LLP
Martinsville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
**DAVID E. COREY**
Deputy Attorneys General
Indianapolis, Indiana

FILED
Aug 12 2014, 9:05 am
CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN RE THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF C.A., L.A., and M.A. (Minor Children) and | ) ) ) ) | |
| B.A. (Mother) and J.A. (Father), | ) ) | |
| Appellants-Respondents, | ) ) | |
| vs. | ) ) | No. 55A04-1401-JT-37 |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee-Petitioner. | ) ) | |

APPEAL FROM THE MORGAN CIRCUIT COURT
The Honorable Matthew Hanson, Judge
Cause Nos. 55C01-1307-JT-255, 55C01-1307-JT-256, 55C01-1307-JT-257

**August 12, 2014**

**OPINION - FOR PUBLICATION**

**CRONE, Judge**

**Case Summary**

B.A. ("Mother") and J.A. ("Father") appeal the trial court's termination of their parental rights to their three children, C.A., L.A., and M.A. Both parents challenge the sufficiency of the evidence supporting the termination order. Mother also argues that her due process rights were violated because she neither was given nor signed a case plan. Finding the evidence sufficient as to both parents and no due process violation, we affirm.

**Facts and Procedural History**

Mother and Father were married and had three children: daughters C.A. and M.A., born in May 2004 and June 2005, and son L.A., born in December 2007. From October 2011 through January 2012, Father sold methamphetamine to a confidential informant. During some of the exchanges, Mother and the children were present. On February 29, 2012, the State charged the parents with various drug and child neglect offenses, and they were subsequently arrested and incarcerated. The Department of Child Services ("DCS") learned of the arrest and placed the children in foster care. The next day, DCS filed a petition alleging that the children were Children in Need of Services ("CHINS") because of the parents' arrest and incarceration. The parents denied the petition.

At the initial hearing on March 14, 2012, the trial court adjudicated the children as CHINS upon the parents' admission that they were unable to care for them. In the trial court's April 2012 dispositional decree, the parents were ordered to, among other things, contact the DCS family case manager ("FCM") on a weekly basis; enroll in programs recommended by DCS; maintain suitable, safe, and stable housing; maintain a legal and

2

stable source of income; not use any illegal controlled substance; ensure that the children are engaged in counseling; complete a substance abuse assessment; submit to random drug screens; and provide the children with a safe and secure environment.

In July 2012, Mother pled guilty to class D felony neglect of a dependent. She was sentenced to an executed term and probation but was released based on time served. In October 2012, Father was convicted of class B felony dealing in methamphetamine. He was sentenced to fourteen years, with ten years executed and four years of probation.

On October 24, 2012, a review hearing was held in the CHINS proceeding. At the hearing, the trial court heard evidence that following Mother's release from jail in July 2012, she secured employment at Grandview Nursing Home. Additionally, Mother was attending required therapy sessions and classes, and the parents were having regular contact with the children. Although Father's contact was constrained because of his incarceration, Mother was having regular visits with the children. According to the trial court: "Overall the progress of the case at this time seemed to be going well towards the goal of reunification." Mother's App. at 15.

At an October 22, 2012 team meeting,[1] the participants learned that Mother was living with a convicted felon who had prior DCS contacts. Mother was informed that she could not live with this person if she intended on seeing the children at the residence they shared. Mother became angry and told the team that she was entitled to a life. Also in October 2012,

---

[1] Apparently, these team meetings were attended by Mother, her various service providers, the FCM, and the court-appointed special advocate ("CASA"). Tr. at 95, 175.

Father was transferred from the Morgan County Jail to the Department of Correction ("DOC") and no longer received services from DCS.

At a December 17, 2012 team meeting, the participants learned that Mother had lost her job and that she was not willing to look for another unless her counselor drove her. Additionally, Mother was to begin unsupervised visitation with the children but expressed anxiety over being unsupervised with them. Nevertheless, during the few partially supervised visits that Mother had with the children, they began to "trust" her again and felt safe. *Id.* at 16.

On January 4, 2013, Mother was arrested for a probation violation. On January 8, 2013, DCS filed notice regarding Mother's failed drug test for her use of amphetamine and methamphetamine. Mother's probation was revoked, and she was released sometime around the end of April 2013.

The court-appointed special advocate ("CASA") filed a report stating that after November 1, 2012, Mother had missed approximately one-third of her scheduled visits with the children. The report also stated that there was no progress toward reunification. Likewise, DCS stated that the parents had made no progress since November 2012.

At the May 22, 2013 permanency hearing, the CASA informed the trial court that C.A. was having trouble with her peers, foster parents, and siblings. C.A. expressed anger at Mother for telling her that she would never use drugs again and stated that she fears going home. M.A. and L.A. were doing well in foster care, and M.A. stated that she wished to remain there. M.A. had written letters to Father and was processing issues of Mother

4

returning to jail. Similarly, L.A. was working through fears involving his parents' incarceration. Overall, following Mother's arrest for violating probation, the children did not trust Mother and did not feel safe with her.

While Mother was in jail for violating her probation, she continued services and was completing the assignments given to her. After Mother's release, she continued to attend counseling, remained drug free, and was searching for employment.

Father was also working hard from prison but felt helpless because of his incarceration. Notwithstanding this fact, Father had indicated that he might be released later in the year and wanted the opportunity to prove himself as a parent. Father was involved in the purposeful incarceration program, which permits time reductions. If Father had successfully completed the program, he could have been released as early as November 2013. According to Father, however, he was "kicked out" of the program because he wrote a letter to his sister that Mother read and interpreted as being threatening to her and her boyfriend. Tr. at 156.

On June 3, 2013, the trial court issued a permanency order in which it found that Father, if "released later this year," should be given a chance to reunite with the children. DCS Ex. 10. The trial court further found that Mother had stabilized and was "trying to right her ways." *Id*. Nevertheless, the trial court observed that "little to nothing ha[d] improved since [the case] began" and approved concurrent permanency plans of reunification and adoption. *Id*.

On July 23, 2013, DCS filed termination petitions as to all three children, and the trial court appointed a CASA in each case. On October 7, 2013, a review hearing was held in the CHINS proceeding and an initial hearing was held in the termination proceeding. During the review hearing, it was shown that Mother was no longer employed by the nursing home, where she had previously worked, and that she had not been visiting with the children. During the termination portion of the hearing, Father stated that his release date is March 5, 2017, and that he had lost his "credit time." Tr. at 20. The parents denied the allegations in the petitions to terminate their parental rights. The factfinding hearing was set for December 16, 2013.

At the start of the hearing, Father's counsel raised the issue that DCS had neglected to file a report, which was a problem because there was to be a review hearing in the CHINS proceeding before the factfinding hearing in the termination proceeding. Father's counsel objected, and Mother's counsel concurred, arguing that if DCS was going to continue the review hearing because it had not filed its report, then the factfinding hearing should be reset as well. Father's counsel maintained that he needed to review what was in that report. The trial court concluded that the testimony that was in the report would be elicited at the hearing and that the witness list had been the same during the entire proceeding. Consequently, the court denied Father's request to postpone the hearing.

Regarding Mother, evidence was introduced that at first, DCS had referred her to services to address parenting issues and substance abuse. As time passed, and Mother no longer abused drugs, the services focused on parenting skills, life skills, budgeting, and

6

transportation. Mother met with her service provider but did not follow up. By the time of the termination hearing, Mother was not meeting the provider because she had moved too far away.

Through probation, Mother completed an intensive outpatient program and another substance abuse program. DCS referred Mother to individual therapy, but she did not complete it. When Mother's therapist changed, she said that she did not want to continue therapy. Further, Mother did not follow through with housing, budgeting, or transportation. Mother appeared to be moving toward reunification in December 2012, but she began missing visits with the children and violated probation by testing positive for drugs. This relapse had a negative impact on the children, who were just starting to trust Mother again.

As to Father, he had remained incarcerated since his initial March 2012 arrest. During Father's incarceration in the Morgan County Jail, he had participated in individual counseling and had good evaluations. However, Father was transferred to the DOC in October 2012, and DCS did not refer services.[2] Father testified that he was again involved in the purposeful incarceration program, and his earliest possible release date is the fall of 2014. The trial court found this to be a "hiccup," in that if Father had completed the program as he should have, his earliest release date would have been the fall of 2013. Mother's App. at 22. Thus, through Father's own actions, he cost himself an additional year.

---

[2] In the termination order, the trial court noted that "the arm of this court does not reach beyond the county jail where DCS is required to provide services." Mother's App. at 22.

While the trial court acknowledged that drug issues were the reason for initial DCS involvement, "the case had morphed into one of care, supervision, and safety of the children." *Id*. at 23. The court concluded that Mother's living arrangements are unsuitable for the children because she resides with her boyfriend, who is a convicted felon and has prior DCS contacts. Indeed, Mother was quoted as saying that she wanted to have a life, and the court opined that "she clearly has chosen that life, with her current boyfriend, over one of safety and security for her children." *Id*. Further, Mother had moved again to Indianapolis into a home with several adults and her boyfriend.

Regarding the children, at the time of the termination hearing, they had been residing in the same foster home since their initial placement. When they first arrived at their foster home, they appeared "wor[n] down," had "bags under their eyes," and did not appear "healthy." Tr. at 45. The children were withdrawn, made no eye contact, and appeared traumatized. Additionally, the children would hide whenever anyone visited the foster home. They had been taught to hide and stay away when someone came to the door.

All of the children were suffering from post-traumatic stress disorder ("PTSD"). Vanessa Bowers, the children's therapist, opined that their PTSD arose from being in the parents' care. More specifically, Bowers described C.A. as having a "40 mile stare" where she zones out and disassociates, which is a safety mechanism against trauma. *Id*. at 139. C.A. was also easily startled and extremely irritable and aggressive. When she arrived at the foster home, she was failing in school. M.A. was very withdrawn and had issues dealing with her siblings. She can become irritable and restless and had intrusive thoughts when she

8

arrived at the foster home. M.A.'s PTSD did not manifest itself as outwardly, which can lead to depression. L.A. was withdrawn, hiding much of the time.

At the time of the termination hearing, the children were doing well in school. C.A. and M.A. were getting straight As, and L.A. was in kindergarten. The children are now the first ones to go to the door when someone comes to the home. The CASA testified that C.A. has "blossom[ed] into a very sweet young girl" and that M.A. is "a bubbly, happy outgoing person who" is "very social." *Id*. at 73-74. Bowers testified that in the four years that she has worked on DCS cases, she has never seen children more comfortable in their foster home. To be sure, the children want to remain in their foster home. Just before the termination hearing, Bowers spoke to C.A. at school about the possibility of returning to the parents. CA began "sobbing uncontrollably" and had a "complete meltdown" and could not return to classes. *Id*. at 144.

During the hearing, the FCM could not recall presenting Mother or Father with a case plan, and neither Mother nor Father signed a case plan. As to Mother, the trial court determined that "this is really insignificant when it was made clear that at all the team meetings with mother the goals and hopes were discussed and understood." Mother's App. at 24. Regarding Father, "the fact that he is in prison and has remained there, is really insignificant since it was impossible for him to partake in any of those activities because of his incarceration anyway." *Id*.

On December 26, 2013, the trial court issued an order as to all three children with over 200 findings of fact and conclusions thereon. The court concluded that DCS had proved by

9

clear and convincing evidence that there is a reasonable probability that the conditions that resulted in the children's removal would not be remedied, that the continuation of the parent-child relationship posed a threat to the children's well-being, that termination was in the best interests of the children, and that DCS had a satisfactory plan, namely, adoption by the foster parents. Accordingly, the trial court terminated Mother's and Father's parental rights to the children. Mother and Father now appeal.

**Discussion and Decision**

"[T]he involuntary termination of parental rights is the most extreme sanction a court can impose on a parent because termination severs all rights of a parent to his or her children. Therefore, termination is intended as a last resort, available only when all other reasonable efforts have failed." *In re A.P.*, 882 N.E.2d 799, 805 (Ind. Ct. App. 2008) (citation omitted). "The purpose of terminating parental rights is not to punish the parents but, instead, to protect their children. Thus, although parental rights are of a constitutional dimension, the law provides for the termination of these rights when the parents are unable or unwilling to meet their parental responsibilities." *Id.* (citation omitted).

A petition to terminate parental rights must meet the following relevant requirements:

(2) The petition must allege:

(A) that one (1) of the following is true:

> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>
> (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required,

10

including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b).

DCS must prove "each and every element" by clear and convincing evidence. *In re G.Y.*, 904 N.E.2d 1257, 1261 (Ind. 2009); Ind. Code § 31-37-14-2. As a standard of proof, clear and convincing evidence requires the existence of a fact to "'be highly probable.'" *In re D.W.*, 969 N.E.2d 89, 94 (Ind. Ct. App. 2012) (quoting *Hardy v. Hardy*, 910 N.E.2d 851, 859 (Ind. Ct. App. 2009)). "It need not reveal that 'the continued custody of the parent[] is wholly inadequate for the children's very survival.'" *Id.* (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1233 (Ind.1992)). "Rather, it is sufficient to show that the children's emotional and physical development are threatened by the parent's

11

custody." *Id.* If the trial court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

We have long had a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). We neither reweigh evidence nor assess witness credibility. *Id.* We consider only the evidence and reasonable inferences favorable to the trial court's judgment. *Id.* Where the trial court enters findings of fact and conclusions thereon, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings and then determine whether the findings support the judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* Clear error is that which "leaves us with a definite and firm conviction that a mistake has been made." *J.M. v. Marion Cnty. Office of Family & Children*, 802 N.E.2d 40, 44 (Ind. Ct. App. 2004), *trans. denied*.

### Section 1 – Mother/Due Process

At the outset, Mother highlights a procedural irregularity that she claims violated her due process rights, namely, that she was neither given nor signed a case plan, which DCS must prepare for each CHINS after negotiating with the child's parent. Ind. Code §§ 31-34-15-1, -2.[3] A copy of the plan must be given to the parent within ten days of its completion, Ind. Code § 31-34-15-3, and a parent's signature indicates that the negotiation took place. *A.P. v. Porter Cnty. Office of Family & Children*, 734 N.E.2d 1107, 1113 (Ind. Ct. App.

---

[3] Apparently, Father also did not receive a case plan, but he does not raise this argument on appeal.

2000), *trans. denied* (2001). The United States Supreme Court has stated that decisions regarding marriage, family life, and raising children are of basic importance in our society and are rights protected by the Fourteenth Amendment from the State's unwarranted interference. *M.L.B. v. S.L.J.*, 519 U.S. 102, 116-17 (1996). A case involving the State's authority to permanently sever a parent-child relationship demands close consideration which the United States Supreme Court requires when family associations are at stake. *Id.*

Here, the FCM testified that during team meetings, she discussed Mother's "motivation towards doing what's necessary to get [the children] back." Tr. at 94. The team made recommendations regarding what Mother had to do. *Id.* at 97. The record indicates that it was not Mother's lack of knowledge or direction as to what she needed to do to get her children back, but rather her lack of participation. More particularly, the purpose of the team meetings was to "come together and make plans to reach [the] goals and for the whole team to know when we reach those goals." *Id.* at 95.

The instant case is unlike *A.P.*, where a panel of this Court reversed a termination of parental rights because of numerous procedural irregularities, including a failure to provide the parents with copies of the case plan, no signed or verified CHINS petition, no dispositional decree containing written findings, no permanency hearing, and additional procedural irregularities. 734 N.E.2d at 1118-19. Here, the only procedural irregularity argued is Mother's failure to receive a case plan. As stated above, she had regular team meetings, the purpose of which was to set goals and make a plan to reach those goals. While we caution the DCS to be more cognizant of the statutory framework by which it is to abide,

13

which includes providing a case plan to each parent, we cannot conclude that its failure to provide one to Mother resulted in a procedural irregularity so egregious that she was denied due process of law. Thus, Mother's argument fails.

**Section 2 – Mother/Sufficiency of Evidence**

Mother next challenges the sufficiency of the evidence supporting the termination of her parental rights to the children. Specifically, Mother disputes the trial court's conclusions that there is a reasonable probability that the conditions which resulted in the children's removal will not be remedied, that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the children's well-being, and that termination of her parental rights is in the children's best interests.

We note that Indiana Code subsection 31-35-2-4(b)(2)(B) is written in the disjunctive and thus requires that only one of the three requirements under subparagraph (B) be proven true by clear and convincing evidence. *B.H. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 355, 364 (Ind. Ct. App. 2013). When determining whether the conditions that led to a child's removal will not be remedied, the trial court must judge a parent's fitness to care for her child at the time of the termination hearing. *In re A.B.*, 924 N.E.2d 666, 670 (Ind. Ct. App. 2010). But the trial court must also evaluate a parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. *Id.* As for whether continuation of the parent-child relationship poses a threat to the child's well-being, termination is proper "[w]hen the evidence shows that the emotional and physical development of a child in need of services is threatened[.]" *In re E.S.*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002).

14

In this case, at the time of the termination hearing, Mother was not meeting with her service providers. Tr. at 101. Mother did not complete her individual therapy, and when her therapists changed, she did not want to continue. *Id*. at 101, 125. Mother's relationship with her live-in boyfriend was problematic because he had prior DCS contacts and a criminal history that made their residence an inappropriate place for the children to visit and live. *Id*. at 86, 88, 178. Even if Mother resolved her housing issues, she still has issues with long-term stability and has not demonstrated the ability to care for the children's daily needs or their well-being. *Id*. at 98.

Perhaps most compelling, Mother seemed to lack the motivation to visit the children, especially after her 2013 release after her probation revocation. One service provider stopped its services after Mother frequently cancelled visits and failed to consistently meet with the provider who transported her to visits. *Id*. at 97. Mother missed several weeks of visits just prior to the December 2013 termination hearing. When she did visit with the children, she talked on the phone throughout the visit and then left thirty to forty-five minutes early, sometimes because it was "too hot." *Id*. at 64. In light of these facts and circumstances, the trial court did not err by concluding that there is a reasonable probability that the conditions which resulted in the children's removal will not be remedied and that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the children.

In determining the best interests of the child, the trial court is required to look beyond the factors identified by the DCS and consider the totality of the evidence. *In re J.S.*, 906

15

N.E.2d 226, 236 (Ind. Ct. App. 2009). "In so doing, the trial court must subordinate the interests of the parent to those of the child." *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013).

> The court need not wait until a child is harmed irreversibly before terminating the parent-child relationship. Recommendations of the case manager and court-appointed advocate, in addition to evidence the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests.

*Id.* (citation omitted).

When the evidence is viewed in its totality, including recommendations to terminate the parent-child relationship from all service providers, the CASA, and the FCM, as well as Mother's disinterest in the children, we cannot say that the trial court clearly erred in determining that it was in the children's best interests that Mother's parental rights be terminated. Therefore, we affirm the trial court's termination order as to Mother.

### Section 3 – Father/Sufficiency of Evidence

Father also contends that there was insufficient evidence to terminate his parental rights. Like Mother, Father argues that the trial court erred by concluding that there is a reasonable probability that the conditions that led to the children's removal will not be remedied, that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the children's well-being, and that termination of his parental rights is in the children's best interests. As stated above, DCS is required to prove *either* that conditions would not be remedied *or* that the parent-child relationship posed a threat to the well-being of the children. Ind. Code § 31-35-2-4(b)(2)(B).

16

Regarding the trial court's conclusion that there is a reasonable probability that the conditions that led to the children's removal will not be remedied, Father argues that he

> will complete his sentence in March 2017; however, because he is participating in the purposeful incarceration program and his sentencing judge stated that if he completes the program he may be modified home detention, work-release, or probation, he could be released as early as August 2014. Because the reason for removal was a lack of a home for the children because of their parent's [sic] incarceration, it is not reasonably probable that the conditions that resulted in the removal of the children will not be remedied.

Father's Br. at 6.

We note, however, that Father's release date has already been pushed back by one year because he wrote a letter threatening Mother and her boyfriend, and the chronological case summary for his criminal case indicates only that the judge would "consider modification" upon Father completing counseling programs in the DOC. DCS Ex. 14 at 4. So it is entirely possible that the children will have to wait almost three years for Father to be released from prison, and they have not visited with him since he was arrested in March 2012. Tr. at 54. Father has "missed a significant part of [the children's] developmental years," and "[u]pon his eventual release from prison, there will be no guarantee that he will be able to care for his children or that he would ever get custody of them." *In re S.P.H.*, 806 N.E.2d 874, 883 (Ind. Ct. App. 2004).

And even if he is released early, Father will have a class B felony methamphetamine dealing conviction on his record, not to mention the challenges of being reintroduced to the real-world temptations that led to him using drugs and selling them out of his home in the

17

children's presence.[4] "Under these circumstances, [Father] will have difficulty establishing a stable life for himself, let alone for [the children]." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006) (rejecting argument of incarcerated parent with multiple felony convictions that conditions leading to child's removal would be remedied by sentence modification), *trans. denied*. As we said in *Castro*, "while we applaud [Father's] efforts to improve himself during his time in prison, we cannot say that the trial court committed clear error when it found that there is a reasonable probability that the conditions leading to [the children's] removal from [Father] will not be remedied." *Id*.

The same may be said for the trial court's conclusion that there is a reasonable probability that continuation of the parent-child relationship with Father will pose a threat to the children's well-being. The children suffered from PTSD as a result of living with Father before his arrest but had "connected to the foster parents" and were "doing incredibly well in school," according to therapist Bowers. Tr. at 141, 140. Bowers opined that the children "would be retraumatized" if they were reunited with their parents, which is "a very negative thing because the more repeated trauma a child suffers, the less likely they are [sic] to heal."

---

4 Father testified that he supported the family with his social security disability payments and supported his drug habit by being a drug "runner." Tr. at 168.

18

*Id*. at 140.  As mentioned above, C.A. began "sobbing uncontrollably" and had a "complete meltdown" when Bowers mentioned the prospect of reunification.  *Id*. at 144.[5]

And finally, based on the foregoing, we conclude that the totality of the evidence, including the recommendations of the FCM, the CASA, and Bowers, supports the trial court's determination that termination of Father's parental rights is in the children's best interests.  Therefore, we affirm the trial court's termination order as to Father.

Affirmed.

BAKER, J., and BARNES, J., concur.

---

[5] We are unpersuaded by Father's reliance on *H.G. v. Indiana Department of Child Services*, 959 N.E.2d 272 (Ind. Ct. App. 2011), *trans. denied* (2012).  In that case, the mother had a strong bond and maintained regular contact with her children while she was incarcerated. There is no evidence that Father has a strong bond with his children, and the record suggests that he has only occasional telephone contact with them.  Tr. at 182.  Unlike in *H.G.*, there have been no problems with the children's foster placement, and the record shows that terminating the parents' rights will "increase the children's sense of stability." *H.G.*, 959 N.E.2d at 293.  And, unlike the mother in *H.G.*, Father has already sabotaged his efforts at obtaining an early release from prison by writing a letter threatening Mother and her boyfriend.

19