Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Nov 17 2014, 6:21 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**DANIELLE L. GREGORY**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
Deputy Attorney General
Indianapolis, Indiana

**CHRISTINA D. PACE**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE TERMINATION OF )
THE PARENT-CHILD RELATIONSHIP OF R.A., )
)
R.A., )
)
    Appellant-Respondent, )
)
       vs. )     No. 49A02-1403-JT-196
)
INDIANA DEPARTMENT OF CHILD SERVICES, )
)
    Appellee-Petitioner. )

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Marilyn A. Moores, Judge
The Honorable Larry E. Bradley, Magistrate
Cause No. 49D09-1308-JT-16200

**November 17, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**NAJAM, Judge**

**STATEMENT OF THE CASE**

R.A., Sr. ("Father") appeals the trial court's termination of his parental rights over his minor child R.A., Jr. ("Child"). Father raises a single issue for our review, namely, whether the Indiana Department of Child Services ("DCS") presented sufficient evidence to support the termination of his parental rights.

We affirm.

**FACTS AND PROCEDURAL HISTORY**

In April 2011, Child was born to T.G. ("Mother"), and Father signed a paternity affidavit at the hospital. At that time, Mother and Father (collectively, "Parents") were unmarried and nineteen- and eighteen-years-old, respectively. The three lived with Father's parents ("Paternal Grandfather" and "Paternal Grandmother," collectively, "Paternal Grandparents")[1] at Father's parents' home. At some point between April 2011 and August 2012, Mother and Father had an argument and ended their relationship. Mother took Child to live with her at the home of her mother ("Maternal Grandmother"). Father continued to live with Paternal Grandparents at their home. Parents arranged custody, visitation, and support without court intervention.

On August 29, 2012, while in Mother's care, Child was admitted to a hospital in Indianapolis with "severe bruising to his head, arm, groin, and legs, blistering on his

---

[1] We note that, throughout the termination hearing, when counsel for DCS referred to Father's relationship with Paternal Grandmother, counsel repeatedly referred to Paternal Grandmother as Father's "mommy." Non-exhaustive examples include: "So, he lives with his mommy . . . ?" Tr. at 16. "His mommy was contacting you?" Id. at 22. "Father also uses his mommy's email account . . . ?" Id. "[Y]ou're [Child's] parent and you're responsible for him . . . . Not your mommy, you." Id. at 67. "Oh, so this was his mommy's input rather than his?" Id. at 84. Counsel continued to do so after Father corrected her. See id. at 67. Counsel's terminology comes across to this court as condescending, disrespectful, and unprofessional. Counsel had strong evidence in support of DCS's petition to terminate Father's parental rights, and she should have relied on that evidence alone, without disparaging Father through her editorial remarks.

thighs and foot, dangerously high blood sugar, and compartment syndrome in his leg that required immediate emergency surgery." Exh. 1. Child's injuries placed him in danger of kidney failure and amputation of his leg. Further, physicians determined that Child's injuries did not result from an accident but from abuse or neglect. Father did not contribute to Child's injuries.

On August 31, 2012, as a consequence of Child's injuries, DCS filed a petition alleging that Child was a child in need of services ("CHINS"), and, at a detention hearing conducted that same day, the juvenile court removed Child from Parents' care. In doing so, the court authorized placement of Child in either foster or relative care after Child's future release from the hospital, where he remained for some time. Despite the approval of relative care, however, DCS advised the court that Child could not be placed in either Maternal Grandmother's or Paternal Grandparents' home. Maternal Grandmother was disqualified from placement because of a history with child protective services, and Paternal Grandparents' home was disqualified due to Paternal Grandfather's "extensive criminal history."[2] Exh. 4. Thus, after his release from the hospital, on September 26, Child received a temporary placement in therapeutic foster care, but, at some point, DCS revoked the disqualification of Maternal Grandmother and subsequently placed Child in her temporary care.[3]

---

[2] Korina Galang, a family case manager with DCS, testified, albeit from an insecure memory, that Paternal Grandfather's criminal history included public intoxication, domestic violence, threatening a police officer, prostitution, and theft. She stated his record did include felony convictions, but Father and Paternal Grandmother disputed this. In this regard, we consider only Galang's testimony because it is the most favorable to the trial court's judgment. See Peterson v. Marion Cnty. Ofc. of Family & Children (In re D.D.), 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), trans. denied.

[3] Child was placed in Maternal Grandmother's care on January 22, 2013. The record does not disclose the reasons for DCS's reversal regarding the placement of Child with Maternal Grandmother.

On October 23, 2012, the court held a hearing and adjudicated Child a CHINS after Father waived a fact-finding hearing and after Mother conceded that Child was a CHINS. While the court ordered that Child stay in his foster-care placement, it cited reunification with Parents as Child's permanency plan. In pursuit of this plan, the court issued a Parental Participation Order on November 13, which, in relevant part, required Father to stay in touch with DCS and to:

- **KEEP ALL APPOINTMENTS:** [Father] agrees that all appointments with any service provider, DCS, or CASA/GAL will be kept or advance notice and good cause will be given to the service provider, CASA/GAL and the Family Case Manager for the missed appointment.

* * *

- **HOME[-]BASED COUNSELING:** [Father] will become engaged in a home-based counseling program referred by the Family Case Manager. All members of the family are to actively participate to the extent recommended by the provider and DCS.

- **VISITATION:** [Father] will attend all scheduled visitations with the child[] and comply with all visitation rules and procedures set forth by DCS or the service provider coordinating and/or supervising the visit(s).

- **ADDITIONAL:** [Father] shall participate in a parenting education program.

Exh. 7 (emphasis in original). Home-based counseling included referrals for Father to complete home-based management and therapy. Father's treatment plan set goals for him to obtain his G.E.D., obtain employment, and secure housing independent of his parents. Father was reminded that, as a result of Paternal Grandfather's criminal record, Father would have to obtain his own home before he could receive custody of Child. Father testified to his awareness of this restriction.

4

By all accounts, at the beginning of Father's involvement with DCS, he engaged with his providers and the services offered to him. He attended supervised visitations with Child, sought employment, and maintained contact with DCS. However, the relationship between Father and DCS soured and Father disengaged.

At least in part, this deterioration resulted from conflicts between Paternal Grandmother and DCS service providers. For example, DCS initially conducted supervised visitations in Paternal Grandparents' home, where Father continued to reside. However, Paternal Grandmother would "bicker[]" with the supervising provider during visits, as well as send quarrelsome emails in the interim, which resulted in subsequent supervised visitations being conducted at a nearby fast-food restaurant. Tr. at 80. Mother testified that she was frustrated with DCS because Father did not injure Child and because DCS previously had placed another of Father's children with Father in Paternal Grandparents' home. Consequently, Paternal Grandmother could not understand why DCS now refused to place Child with Father based on Paternal Grandfather's criminal history.[4]

Father's issues with visitation extended beyond Maternal Grandmother, however. DCS also reported that Father did not engage with Child during visits. If Mother also attended, Father deferred parenting to Mother, and if Paternal Grandmother attended, Father mostly deferred parenting to Paternal Grandmother. Father's problems with visitation culminated on December 5, 2012. Father arrived late to that visit, which took

_____

[4] The record discloses that, when DCS placed Father's other child with him in Paternal Grandparents' home, Father told DCS that Paternal Grandfather did not live in the home. Again, we note that Father and Paternal Grandmother disputed this, but we consider only the evidence most favorable to the judgment.

5

place at the restaurant, and Father brought his brother, his brother's girlfriend, and Maternal Grandmother with him. Although these individuals did not participate in the visitation, according to DCS providers, their mere presence made the visitation "awkward," "uncomfortable," and "hostile." Tr. at 81-82, 96. As a result, DCS ended the visitation early, and, when the providers attempted to discuss the visitation with Father, he placed his earbud headphones into his ears, refused to participate, and walked out on the discussion.

After this incident, DCS again moved the visitations, this time to Damar Services, located in Decatur, and informed Paternal Grandmother that she could no longer attend. Father, who did not have a car, relied on Paternal Grandmother for transportation, and Paternal Grandmother informed DCS that, if the visits were moved to Damar, Father would not attend. Paternal Grandmother stated that the visits were too far away. Father also indicated to DCS that he had no means of transportation to Damar. In turn, DCS recommended that Father obtain a bus pass, which DCS could help Father attain, to attend visitations. Father did not do so. Instead, he told his case manager, "I'm not doing anything anymore." Tr. at 15. Father did not visit Child after December 5.

DCS also issued unsuccessful discharges to Father for all other services—home-based therapy, home-based case management, and parenting education classes—because Father did not engage his service providers and did not achieve his treatment goals. Father did not obtain his G.E.D.,[5] failed to obtain employment,[6] and did not acquire

_____

[5] Father testified that he had "been thinking about" enrolling in a G.E.D. program, but "ain't got to it yet." Tr. at 60.

6

independent housing.[7]  Father applied for only four jobs, which his case manager regarded as insufficient.  And Father attended only one of eight parenting education classes because "not[h]ing was different" from the parenting education classes that he took in high school.  Id. at 65.  Despite this, DCS either re-issued, renewed, or kept open Father's referrals for services, but Father never reengaged.  Finally, Father failed to appear at several court hearings in 2013.  Consequently, on August 27, 2013, DCS changed Child's permanency plan from reunification with Parents to adoption by Maternal Grandmother, with whom, during his placement in her care, Child had thrived.  Mother consented to the adoption,[8] but Father did not.  Father stated that he would consent, however, if Paternal Grandmother could adopt Child, but, due to Paternal Grandfather's criminal record, this was not an option.

The juvenile court held a parental rights termination hearing on February 20, 2014, at which all DCS providers recommended severance of Father's parent-child relationship with Child, and, after the hearing, the court terminated Father's parental rights.  In so holding, the court entered several findings and conclusions:

> 8.  [Father] resided with his mother, father, and [other] son through the [CHINS] case.

---

[6] Father testified that he had worked side jobs but got paid under the table and had not paid taxes. Further, at the time of the termination hearing, he had been unemployed for several months.  And Father stated that, to support Child, he "would have to go out and find an actual job." Tr. at 67.

[7] Father testified that he did not acquire independent housing because he "can't get stable enough to actually move out of [his parents'] house and keep money in [his] pocket to take care of [his] kids and pay bills and all that." Tr. at 58.  It appears that Paternal Grandmother supported Child through her food stamps; Father did not receive public assistance, but testified that he and Child were included under Paternal Grandmother's assistance.  In addition, Father testified that he had no current income other than the support he received from his Parents.

[8] Mother was, therefore, dismissed from the action.

9. [Father] needed independent housing as a condition to having [Child] placed with him since the paternal grandfather's criminal history precluded placement in the home.

10. [Father's] employment is inconsistent with him not having money to get to visitation. He does "side jobs" but has not worked for two months.

11. Services ordered and referred included home[-]based case management and therapy. Home[-]based services goals included obtaining a GED, employment and housing, budgeting[,] and working on parenting skills.

12. Because of [Child's] severe injuries sustained while in his mother's care, it was thought that reunification would move toward [Father] at the beginning of the [CHINS] case.

13. [Father] initially engaged, and appeared motivated, in services. However, by late 2012, he had stopped participation and informed the family case manager that he would not do anything else". [sic]

14. [Father] does not feel he needs services to appropriately raise [Child] and provide for him.

15. [Father] did not make progress on established goals. He failed to follow up on job applications and "has not gotten to his GED yet."

16. [Father] attended one of eight parenting education sessions. His behavior at visits was described as uncomfortable and non-engaged.

17. As a result of what appeared to be intermeddling by [Father's] family members, his visitation was moved to Damar. [Father] failed to follow up with visitation after that and last saw his son in December of 2012. He has not contacted the family case manager to inquire as to [Child].

18. [Father] failed to attend almost all [CHINS] Court hearings after 2012.

19. [Child] is in pre-adoptive care with his maternal grandmother with whom [Child] has spent most of life. He has been observed as being very bonded with his grandmother.

20. There is a reasonable probability that the conditions that resulted in [Child's] removal and continued placement outside the home will not be

remedied by his father. While in services, [Father] failed to make progress, due to lack of follow through. He then quit services, including visitation and did not show an interest in his child. [Father] has wasted the opportunity extended to him to be an appropriate parent to [Child].

21. Continuation of the parent-child relationship poses a threat to [Child's] well-being in that it would pose as a barrier in obtaining permanency for him through an adoption.

22. [Child's] Guardian ad Litem, Lindsay Hakes, recommends adoption as being in the best interests of [Child]. She bas[e]s this on [Father's] lack of participation in services, his lack of knowing [Child], and [Child] being bonded now into his current home.

23. There exists a satisfactory plan for the future care and treatment of [Child], that being adoption.

24. Termination of the parent-child relationship is in the best interests of [Child]. Termination would allow for [Child] to be adopted into a stable and permanent home where his needs will continue to be met.

Appellant's App. at 11-12. This appeal ensued.

## DISCUSSION AND DECISION

Father contends that DCS failed to present sufficient evidence to support the termination of his parental rights under Indiana Code Section 31-35-2-4(b)(2). He challenges the court's conclusions that "[t]here is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied," I.C. § 31-35-2-4(b)(2)(B)(i), and that "[t]here is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child," I.C. § 31-35-2-4(b)(2)(B)(ii). "Because that provision is written in the disjunctive, we address only the dispositive issue of whether sufficient evidence supports the juvenile court's finding that "[c]ontinuation of the parent-child relationship poses a threat to [Child's] well-being in that it would pose as a

9

barrier in obtaining permanency for him through an adoption." Father also challenges the juvenile court's conclusion that termination of the parent-child relationship is in Child's best interests because it would provide a "stable and permanent home where his needs will continue to be met." Appellant's App. at 12. We address each of Father's contentions in turn.

We begin our review of this issue by acknowledging that "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." Bailey v. Tippecanoe Div. of Family & Children (In re M.B.), 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. Schultz v. Porter Cnty. Ofc. of Family & Children (In re K.S.), 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. Id. Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. Id. at 836.

Before an involuntary termination of parental rights can occur in Indiana, in relevant part, DCS is required to allege and prove:

(A)    that one (1) of the following is true:

        (i) The child has been removed from the parent for at least
        six (6) months under a dispositional decree.

* * *

10

(B) that one (1) of the following is true:

    (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

    (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

\* \* \*

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2) (2014). That statute provides that DCS need establish only one of the requirements of subsection (b)(2)(B) before the trial court may terminate parental rights. DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.), 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2).

When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. Peterson v. Marion Cnty. Ofc. of Family & Children (In re D.D.), 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), trans. denied. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. Judy S. v. Noble Cnty. Ofc. of Family & Children (In re L.S.), 717 N.E.2d 204, 208 (Ind. Ct. App. 1999). trans. denied.

11

Here, in terminating Father's parental rights, the trial court entered specific findings of fact and conclusions thereon. When a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review. Bester v. Lake Cnty. Ofc. of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. Id. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." Quillen v. Quillen, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. In re L.S., 717 N.E.2d at 208.

Father concedes that Child had been removed from his care for a period of at least six months and that the adoption plan was satisfactory. See I.C. §§ 31-35-2-4(b)(2)(A)(i), (D). However, Father challenges the juvenile court's findings, numbered nine, ten, thirteen, and fifteen—"that Father needed independent housing, his employment was inconsistent with his having money to visit [Child], [Father] stopped participating in services, and [Father] did not make progress on established goals . . . ." In addition, Father asserts that these findings fail to support the court's conclusions.

**Findings of Fact**

Father first argues that the juvenile court's finding that he needed independent housing is clearly erroneous because his housing with Paternal Grandparents was stable, as evidenced by the prior placement by DCS of his other child in that home and by Paternal Grandmother's testimony that the home contained everything to meet Child's

needs. He concludes that "[t]here was no testimony by any witness that the condition of Father's home was inappropriate in anyway [sic]." Appellant's Br. at 17.

However, Father's argument amounts to a request for us to reweigh the evidence, which we will not do. And Father misstates the evidence. Korina Galang, a Family Case Manager with DCS, testified that she had discussed at length with Father that Paternal Grandfather's criminal history precluded Child's placement into Paternal Grandparents' home. Father testified that he knew about this restriction but did not understand it because he did not harm Child and because of the placement of his other child into his care while he lived in that home.[9] However, the evidence most favorable to the termination demonstrates that DCS only placed that child into Father's care because Father and his family had told DCS that Paternal Grandfather did not live in the home. It does not matter that Father did not harm Child or that the home could provide other necessities; DCS could not place Child with Father while he lived in Paternal Grandparents' home, and Father failed to obtain independent housing. This finding is not clearly erroneous.

Next, Father contends that he received sufficient income, "under the circumstances," to provide a stable home for Child, which, he argues, makes finding 10 clearly erroneous. Id. at 22. Moreover, he asserts that his income was irrelevant to his ability to visit with Child. But the evidence indicates the opposite. Father never held or obtained steady, established employment throughout the pendency of the termination proceedings. He lacked a G.E.D., which, he acknowledges, hindered his employment

_____

[9] Father also disputes the severity of Paternal Grandfather's criminal history, based on Father's and Paternal Grandmother's testimony. But this argument would require us to reweigh the evidence and judge the credibility of witnesses.

prospects, but he never enrolled in a G.E.D. program. Consequently, Father worked only odd jobs for under-the-table pay. Indeed, far from having a sufficient income, Father testified that both he and Child relied on Paternal Grandparents for support; he acknowledged his own instability and inability to appropriately manage his money. Father did not have a car, and he did not exercise visitation after December 2012. Finally, Father testified that, in order for him to independently care for Child, he would have to "find an actual job." Tr. at 67. Thus, the trial court could fairly infer that Father's lack of employment and income contributed to Father's nonparticipation in visitation. Had Father obtained a job, he would have reduced his dependence on Paternal Grandmother. Further, with an income, he could have purchased a car or bus passes to get to visitations. Father's argument on this finding does not persuade us that the juvenile court's finding is clearly erroneous.

Father also asserts that finding thirteen, which states that Father stopped participating in services and would not pursue DCS services further, is clearly erroneous. But Father concedes that he failed to complete all DCS-provided services. And, rather than present a cogent explanation about why this finding is clearly erroneous, Father instead attempts to offer excuses for failing to complete the court-ordered services. See Ind. Appellate Rule 46(A)(8)(a). He states that he "did not find it necessary to complete the same [parenting] class again," that he "did not voluntarily stop participating in visitation," and that DCS "has failed to show how these services were necessary for the successful reunification of [Child] in Father's care." Appellant's Br. at 23-24. As an initial matter, the court ordered father to complete the DCS services, and it could have

14

logically concluded that these services were necessary.  Father conceived two children as a minor, both of whom required DCS services.  Moreover, Father lived with his parents, lacked a high-school education, had no job, and relied entirely on his parents for his support.  Moreover, Father's providers testified that he did not parent during the early visitations that he did attend but, instead, deferred to others.  And the evidence shows that Father told his care providers that he would not do "anything anymore."  Tr. at 15.  Thus, we decline to hold that this finding is clearly erroneous.

Finally, Father contends that finding fifteen, which states that Father failed to make progress on his established goals, is clearly erroneous.  But, again, Father does not dispute that he did not get his G.E.D., did not secure stable employment, and did not obtain independent housing.  For all the reasons above, we again hold that this finding is supported by sufficient evidence.  We affirm on this issue.

## Well-Being of Child

Father also contends that the juvenile court's findings of fact do not support its conclusions under Indiana Code Section 31-35-2-4(b)(2).  We again note that Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive.  Thus, with regards to subsection (B), we consider only the dispositive issue of whether the court's findings support the conclusion that "[t]here is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child."  I.C. § 31-35-2-4(b)(2)(B)(ii).  In this regard, continued custody by the parent need not be "wholly inadequate for the children's very survival.  Rather, it is sufficient to show that the children's emotional and physical development are threatened by the parent's custody."

15

C.A. v. Ind. Dept. of Child Servs., 15 N.E.3d 85, 92 (Ind. Ct. App. 2014). "The court need not wait until a child is harmed irreversibly before terminating the parent-child relationship." Id. at 94 (quoting In re J.C., 994 N.E.2d 278, 290 (Ind. Ct. App. 2013)).

In C.A., we held that evidence was sufficient to terminate the parent-child relationship where the parent failed to meet with her service providers, did not complete therapy, resided with a person who had a substantial criminal history, had long-term stability issues, lacked motivation to visit the children, missed several weeks of visitation, and was disengaged during the visitations that she did attend. Id. We agree with the analysis in C.A. Thus, we hold that the court's findings here support its conclusion that a continued parent-child relationship threated the well-being of Child.

### Child's Best Interests

Section 31-35-2-4(b)(2) also requires that termination of the parent-child relationship be in the best interests of the child, and Father contends the evidence does not support this determination. Here, "the trial court [was] required to look beyond the factors identified by DCS and consider the totality of the evidence. In so doing, the trial court must [have] subordinated the interests of the parent to those of the child." C.A., 15 N.E.3d at 94. A juvenile court should consider the recommendations of the case manager and court-appointed advocate when it determines whether termination is in a child's best interest. See J.C., 994 N.E.2d at 290. "A parent's historical inability to provide a suitable environment, along with the parent's current inability to do the same, supports finding termination of parental rights is in the best interests of the children." Id.

16

We hold that termination was in Child's best interests. All DCS providers who testified and Child's guardian ad litem recommended termination of the parent-child relationship between Father and Child. Further, Father was wholly unable, both historically and at the time of the termination hearing, to support Child. Again, Father was unemployed, undereducated, and noncompliant with his court-ordered parenting plan. Father relied on Paternal Grandparents for sustenance and testified that he could not support himself or maintain an independent residence. Father, therefore, could not provide a suitable environment for child or fulfill his parental responsibilities. The evidence was sufficient to conclude that the child's best interests supported termination of the parent-child relationship, and we affirm on this issue.

Affirmed.

BAILEY, J., and PYLE, J., concur.