## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 16 2020, 11:17 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

| ATTORNEY FOR APPELLANT | ATTORNEY FOR APPELLEE |
|---|---|
| David W. Stone, IV<br>Anderson, Indiana | Katherine A. Cornelius<br>Deputy Attorney General<br>Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Involuntary Termination of the Parent-Child Relationship of T.R. and M.R. (Minor Children)<br><br>and<br><br>B.R. (Father),<br><br>*Appellant-Respondent,*<br><br>v.<br><br>Indiana Department of Child Services,<br><br>*Appellee-Petitioner* | June 16, 2020<br><br>Court of Appeals Case No. 19A-JT-2918<br><br>Appeal from the Madison Circuit Court<br><br>The Honorable George Pancol, Judge<br><br>Trial Court Cause Nos. 48C02-1902-JT-49, - 50 |

**Crone, Judge.**

# Case Summary

[1] B.R. (Father) appeals the involuntary termination of his parental rights to his minor children T.R. and M.R. We affirm.

# Facts and Procedural History

[2] The trial court's relevant findings of fact reveal that A.R. (Mother)[1] and Father are the biological parents of T.R., born on March 3, 2014, and M.R., born on March 18, 2017 (the Children). The Indiana Department of Child Services (DCS) filed a child in need of services (CHINS) petition in August 2017 due to neglect allegations after Mother abandoned the Children by leaving them with a boyfriend she had known for only a matter of weeks and not returning. Mother was reportedly "shooting up pretty bad" and nobody could locate her. Appellant's App. Vol. 2 at 47, 55. Father was incarcerated at the time. Neither parent appeared for the initial hearing, and the trial court ordered the Children detained and placed in foster care.

[3] Thereafter, Father waived factfinding and Mother subsequently admitted the CHINS allegations. Following a dispositional hearing, and pursuant to court order, Father was directed to participate in services, including fatherhood engagement class, substance abuse treatment, random drug screens, home-based case work, and visitations with the Children (Mother was ordered to participate in similar services). At the six-month review hearing, the trial court

---

[1] Although Mother's parental rights were also terminated, she is not a party to this appeal. Consequently, we will recite facts primarily regarding Father.

determined that both Mother and Father had "partially complied" with the Children's case plan. Appealed Order at 3. Regarding Father, the court noted that he was enrolled in a drug treatment program through the Department of Correction (DOC) and was meeting with a fatherhood engagement worker. Accordingly, reunification remained the permanency plan for the Children. However, at the time of the one-year review hearing, both Mother and Father were incarcerated. Regarding Father, the trial court determined that Father had failed to comply with the Children's case plan and had not had any visits with the Children.

[4] In February 2019, after the Children had been removed from their parents' care for eighteen months, the trial court held another review hearing. The trial court determined that neither parent had complied with services. Indeed, Father had done nothing to improve his situation or to enhance his ability to parent the Children. Rather, he engaged in behavior in clear opposition to that goal. Father had been removed from the Edinburgh Correctional Facility for a serious conduct violation and moved to the Pendleton Correctional Facility. Specifically, he was charged with and found guilty of conspiracy and attempted drug trafficking by the DOC. The permanency plan for the Children was changed from reunification to termination.

[5] DCS filed petitions to terminate both Mother's and Father's parental rights on February 19, 2019. The termination factfinding hearing took place over several days, concluding on August 13, 2019. On September 23, 2019, the court entered its termination order which included extensive and detailed findings of

fact and conclusions thereon. In sum, the trial court concluded that: (1) there is a reasonable probability that the conditions that resulted in the Children's removal and continued placement outside the home will not be remedied by either Mother or Father; (2) there is a reasonable probability that continuation of the parent-child relationship between each parent and the Children poses a threat to the Children's well-being; (3) termination of the parent-child relationship between both parents and the Children is in the Children's best interests; and (4) DCS has a satisfactory plan for the Children's care and treatment, which is adoption. Accordingly, the trial court determined that DCS had proven the allegations of the petitions to terminate by clear and convincing evidence and therefore terminated both Mother's and Father's parental rights. Only Father now appeals.

## Discussion and Decision

"The purpose of terminating parental rights is not to punish the parents but, instead, to protect their children. Thus, although parental rights are of a constitutional dimension, the law provides for the termination of these rights when the parents are unable or unwilling to meet their parental responsibilities." *In re A.P.*, 882 N.E.2d 799, 805 (Ind. Ct. App. 2008) (citation omitted). "[T]ermination is intended as a last resort, available only when all other reasonable efforts have failed." *Id.* A petition for the involuntary termination of parental rights must allege in pertinent part:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove that termination is appropriate by a showing of clear and convincing evidence. *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016). If the trial court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[7] "We have long had a highly deferential standard of review in cases involving the termination of parental rights." *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92 (Ind. Ct. App. 2014).

> We neither reweigh evidence nor assess witness credibility. We consider only the evidence and reasonable inferences favorable to the trial court's judgment. Where the trial court enters findings of fact and conclusions thereon, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings and then determine whether the findings support the judgment. In deference to the trial court's unique position to

assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous.

*Id.* at 92-93 (citations omitted). "A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *In re R.J.*, 829 N.E.2d 1032, 1035 (Ind. Ct. App. 2005).

## Clear and convincing evidence supports the trial court's conclusion that there is reasonable probability of unchanged conditions.

[8] Father challenges the sufficiency of the evidence to support the termination of his parental rights.[2] Specifically, he challenges the trial court's conclusion that there is a reasonable probability that the conditions that resulted in the Children's removal from and continued placement outside the home will not be remedied.[3] In determining whether there is a reasonable probability that the conditions that led to the Children's removal and continued placement outside the home will not be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, "we must

---

[2] Father asserts that a few of the trial court's findings of fact are "improper" for various reasons and "should be disregarded" Appellant's Br. at 9. We decline to specifically address Father's claims regarding these findings, as the trial court entered extensive unchallenged findings in support of its termination of Father's parental rights. *See T.B. v. Ind. Dep't of Child Servs.*, 971 N.E.2d 104, 110 (Ind. Ct. App. 2012) ("Unchallenged findings stand as proven, and we simply determine whether the unchallenged findings are sufficient to support the judgment."), *trans. denied*.

[3] Father also challenges the trial court's conclusion that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to Children's well-being. However, Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, such that, to properly effectuate the termination of parental rights, the trial court need only find that one of the three requirements of that subsection has been established by clear and convincing evidence. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*. Accordingly, we will address only one of the three requirements.

ascertain what conditions led to their placement and retention in foster care." *Id*. Second, "we 'determine whether there is a reasonable probability that those conditions will not be remedied.'" *Id*. (quoting *In re I.A.*, 934 N.E.2d 1132, 1134 (Ind. 2010). In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions, and balancing a parent's recent improvements against "habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation." *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (quoting *K.T.K.*, 989 N.E.2d at 1231). "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007) (citation omitted), *trans. denied*. The evidence presented by DCS "need not rule out all possibilities of change; rather, DCS need establish only that there is a reasonable probability that the parent's behavior will not change." *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

[9] Here, the Children's initial removal from the home occurred while Father was incarcerated, and Father remained incarcerated at the time of the termination proceedings. Accordingly, Father urges that neither the evidence that supported the initial removal, nor the evidence establishing that there is a reasonable probability that the conditions that led to the Children's removal

and continued placement outside the home will not be remedied, should be applied to him. He is mistaken.

[10] During the termination proceedings, Father testified that, although married to Mother, he did not live with her prior to his incarceration and had never cared for the Children alone. Father stated that he has three additional children by other women, and he admitted that he has never paid child support for any of his children. Father admitted to having a long-standing opioid addiction, and the trial court took judicial notice that, in addition to his most recent convictions, Father has numerous prior felony convictions (several involving controlled substances). Regarding his most recent convictions, Father explained that, in February 2017, he pled guilty to charges filed in November 2016 (level 6 felony unlawful possession of a syringe, level 6 felony operating a vehicle as a habitual traffic violator, and class A misdemeanor false informing), and received a two-year sentence that was stayed pending his successful completion of the Madison County Drug Court Program. This occurred before M.R. was born, and Father testified that he barely even saw M.R. because he was "very busy" with Drug Court and work release. Tr. Vol. 2 at 76. Father twice relapsed into illicit drug use and was subsequently ordered back to criminal court. The criminal court ordered a second attempt at Drug Court participation, but Father was again discharged as unsuccessful after he admitted to using Suboxone without a prescription.

[11] Father visited the Children only one time before being incarcerated in October 2017, and he has remained incarcerated during most of their young lives.

During the pendency of the CHINS proceedings, Father did not visit with the Children, and he failed to maintain contact with DCS to arrange those visits.[4] Father further admitted that he never wrote letters or sent gifts to the Children. As noted by DCS, Father's actions demonstrate a "lack of commitment to complete the actions necessary to preserve [the] parent-child relationship." *Lang*, 861 N.E.2d at 372 (citation omitted). Father then made an already bad situation worse when he was found by the DOC to have committed a serious violation of the rules of the Edinburgh Correctional Facility by attempting to traffic drugs and phone cards into the facility, which resulted in him being transferred from a "level one (1) prison" to a "level three (3) [prison]."[5]

[12] The foregoing evidence supports a finding that, during the pendency of the CHINS proceedings, Father hindered rather than enhanced his ability to fulfill his parental obligations. Not only has Father failed to build or maintain any relationship with the Children, but he has also continually and consistently rebuked rehabilitative efforts and chosen instead to participate in criminal

---

[4] Father blames his lack of contact with DCS, and his failure to visit with the Children, on the DCS family case manager. The family case manager testified that she tried to maintain contact with Father; she denied that Father had ever attempted to contact her; and she stated that, in the beginning, it was Mother who would not allow the Children to visit with Father at the correctional facility. The case manager further recounted the difficulties of locating and trying to communicate with Father due to his disciplinary transfer between facilities. It was the trial court's prerogative to assign weight and credibility to this evidence. *C.A.*, 15 N.E.3d at 92.

[5] It is undisputed that, following a disciplinary hearing, Father was found guilty of this conduct violation by the DOC disciplinary board. DCS Ex. D at 149. When asked about the violation during the termination proceedings, on the advice of counsel, Father asserted his Fifth Amendment privilege against self-incrimination. Tr. Vol. 2 at 62. In civil proceedings, a court is permitted to draw a negative inference from a claim of the Fifth Amendment privilege against self-incrimination. *Matter of Ma.H.*, 134 N.E.3d 41, 47 (Ind. 2019), *cert. denied* (2020).

activity. Father's habitual pattern of conduct and unwillingness to change his negative behavior indicates a substantial probability of future neglect or deprivation for these Children.

[13] In sum, clear and convincing evidence supports the trial court's conclusion that there is a reasonable probability that the conditions that resulted in the Children's removal from and continued placement outside the home will not be remedied by Father. Father does not specifically challenge the trial court's conclusions that termination of his parental rights is in the Children's best interests or that DCS has a satisfactory plan for the Children's care and treatment, which is adoption. Therefore, we affirm the trial court's termination of Father's parental rights.

[14] Affirmed.

Bailey, J., and Altice, J., concur.