## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 08 2017, 6:43 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT D.S.

Ernest P. Galos
Public Defender
South Bend, Indiana

ATTORNEY FOR APPELLANT T.S.

Mark S. Lenyo
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of D.S. Jr. and J.S. (Minor Children) and

D.S. (Father) and T.S. (Mother),

*Appellants-Respondents,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

September 8, 2017

Court of Appeals Case No. 71A03-1704-JT-823

Appeal from the St. Joseph Probate Court

The Honorable James N. Fox, Judge

The Honorable Graham C. Polando, Magistrate

Trial Court Cause Nos. 71J01-1607-JT-44, -45

**Crone, Judge.**

## Case Summary

[1] D.S. ("Father") and T.S. ("Mother") (collectively "Parents") each appeal the involuntary termination of their parental rights to their children, D.S. Jr. and J.S. (collectively "the Children"). Mother and Father both take issue with the trial court's conclusion that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the Children's well-being. Father separately contends that the trial court clearly erred in concluding that termination of the parent-child relationship is in the Children's best interests. Finding no error, we affirm.

## Facts and Procedural History

[2] The facts most favorable to the termination orders show that D.S. Jr. was born in January 2007 and J.S. was born in August 2009. In May 2015, after the family was evicted from their home for undisclosed reasons, Father was living in a homeless shelter, and Mother was living in a hotel with eight-year-old D.S. Jr. and five-year-old J.S. The Indiana Department of Child Services ("DCS") received a report that the Children were living in a "disgusting" hotel room, Mother was using crack cocaine in the Children's presence, J.S. had untreated ringworm on his forehead, and Mother and Father were involved in a domestic dispute in Children's presence. DCS Ex. 1 at 10.

[3] A DCS family case manager visited Mother at the hotel and deemed the hotel room unsuitable for the Children. The room was cluttered with bags of

clothing and other items, there were old cigarette butts scattered throughout the bathroom, and there were no clean towels, no clean clothes, and no food for the Children. J.S. had ringworm on his forehead. The family case manager learned that the Children were not attending school. Mother stated that she did not send the Children to school because she did not want them raised by the "devil." *Id*. Mother began to scream at the case manager and called her a "devil." *Id*. The case manager feared for her safety and called for police assistance.

[4] DCS removed the Children from Mother's care. At some point, DCS attempted to contact Father and learned that he was living in the homeless shelter, had not been in communication with Mother, and thought that Mother and the Children were living at the YWCA and that the Children were attending school.

[5] DCS filed petitions alleging that the Children were children in need of services ("CHINS") and placed the Children in foster care. A child therapist evaluated the Children. The therapist diagnosed D.S. Jr. with generalized anxiety disorder. Tr. at 72. In addition, D.S. Jr.'s doctor diagnosed him with ADHD. *Id*. The therapist diagnosed J.S. with generalized anxiety disorder and disruptive behavior disorder. *Id*. at 74. The therapist began weekly therapy with the Children.

[6] While the CHINS petition was pending, DCS offered Mother and Father supervised visitation. Almost immediately, Mother's visitation was suspended

due to her inappropriate and disturbing behavior. In August 2015, Mother was attending supervised visitation at a DCS-selected facility when she told the Children not to listen to their foster parents and referred to the Children's foster parents and the DCS service providers as the "devil" and called them liars. DCS Ex. 1 at 24. Mother became increasingly aggressive and belligerent, disrupting other families in the facility. Ultimately, her behavior required the intervention of other staff members and requests to the police for assistance. Tr. Vol. 2 at 91. Thereafter, DCS filed a motion to suspend Mother's visitation, which the trial court granted.

[7] In October 2015, following a hearing, the trial court adjudicated the Children CHINS. In November 2015, the trial court held a dispositional hearing and issued a dispositional decree ordering Mother and Father to participate in the following services: begin home-based counseling; undertake parenting assessments and follow all recommended services; undertake psychological evaluations and follow all recommended services; and participate in supervised visitation. Mother was also ordered to complete a substance abuse assessment and follow all recommended treatment and submit to random drug screens.

[8] Initially, Mother was noncompliant with the dispositional decree. At the end of 2015, she was incarcerated for trespass and conversion. Father also initially failed to comply with the dispositional decree, although he did continue to exercise visitation with the Children. While Father's visitations initially went well, over the course of 2015 he stopped attending visits or confirming that he was going to attend, and his visitation dropped from twice a week to once a

week. *Id*. at 91. In addition, the visitation supervisor observed that the Children did not want to go to visitation and D.S. Jr. would become anxious and say, "[M]aybe we should go back … maybe we shouldn't be coming." *Id*. at 92. In January 2016, Father was very late to arrive at a visitation. When he did arrive, he was visibly intoxicated, and smelled strongly of alcohol, and the supervisor saw an empty beer can roll out of his car. *Id*. at 97-98. As a result, the supervisor cancelled that day's visit, and DCS filed a motion for modification of the dispositional decree seeking to have Father's sobriety monitored. DCS Ex. 1 at 68. In February 2016, the trial court modified the dispositional decree and ordered Father to submit to random drug and alcohol screens.

[9]   In February 2016, Father completed a psychological parenting evaluation with Dr. Leroy Burgess. Father's test results showed low parenting function. Dr. Burgess recommended that Father receive substance abuse education, parenting education, supervised visitation, and home-based case management. Immediately following Father's evaluation, Dr. Burgess would not have been able to recommend reunification and would have had concerns about Father's parenting functions if he did not follow the recommendations.

[10]  In April 2016, Mother submitted to psychological parenting evaluation with Dr. Burgess. He diagnosed her with bipolar disorder, stimulant use disorder in early remission, unspecified personality disorder, and bipolar type schizoaffective disorder. He recommended that she receive psychotherapy and undergo a medical evaluation to determine the appropriateness of psychotropic

medication, refrain from substance abuse, undergo substance abuse treatment, and participate in supervised visitation and homebased case management.

[11] In June 2016, Mother and Father established a home together, and they began to comply with some of the requirements in the dispositional decree. They began home-based case management, and their home was determined to be appropriate. In addition, they began home-based therapy, but their participation was poor. Father attended only two or three times and was transferred to a parenting group, which he attended only once or twice. Tr. at 111. Mother attended home-based therapy only once or twice in the first three months, although her attendance became more consistent after October 2016 and after DCS filed its petition to terminate her parental rights.

[12] In July 2016, DCS filed petitions for the involuntary termination of Mother's and Father's parental rights to the Children, which it subsequently amended. Father's App. Vol. 2 at 35, 50.

[13] In July 2016, Mother finally completed two assessments required by the dispositional decree, but they were unproductive. She submitted to a substance abuse assessment, during which she admitted to using cocaine and revealed that she viewed it as "a natural substance to be used as medication" and felt that it was "perfectly okay and that nobody had a right to interfere with it." Tr. Vol. 2 at 29-30. When the addictions coordinator recommended that Mother undergo an intensive outpatient addictions treatment program, Mother became "furious" and accused the coordinator of "tricking" her. *Id.* at 29. Mother also

failed to take responsibility for her actions and spent much of the appointment "verbally bashing DCS." *Id*. at 31. She stated that DCS was "acting as a devil or demon to torture her," and "her children were hers" and "DCS was not within their rights to interfere." *Id*. at 29. Mother failed to attend any more appointments with the addictions counselor.

[14] Mother also submitted to a psychosocial intake with a licensed clinical social worker. Mother reported a history of bipolar disorder and cocaine use, and that she had been hospitalized four times for manic behavior and had taken psychiatric medications but had not had any psychiatric treatment for the last seven years. *Id*. at 86. The clinician diagnosed Mother with unspecified bipolar disorder and cocaine use disorder and referred Mother for a psychiatric evaluation to determine whether medications would be helpful in treating her mental health issues. *Id*. at 87. Mother never followed through with completing the psychiatric evaluation. *Id*.

[15] In September or October 2016, Father was scheduled to have weekly supervised visitation. Over the course of four months, about half the visits were cancelled due to Father's failure to confirm the appointment or show up on time or because he cancelled due to lack of transportation. During visitation, Father said inappropriate things to the Children such as, "[I]f I had a stick I would hit you with it," and "[Y]ou're going to go to hell." *Id*. at 76. The visits made both Children "very upset" and "worried about their physical safety because those are things that have happened to them in the past." *Id*. The foster parents observed that D.S. Jr. did not want to go to visitations and would cry and try to

get out of attending them. *Id*. at 19. As for J.S., "most of the time he did not want to go" and would say he hoped that there would be no visitation. *Id*. at 19-20.

[16] In January 2017, the trial court held a termination hearing. By the time of the hearing, Father had not completed a substance abuse assessment and had refused all requests for drug screens. Mother had refused twenty-one requests for drug screens and had also refused screens every time she appeared for a hearing. Father testified that he knew nothing about Mother's cocaine use. *Id*. at 167. The Children's therapist testified that the Children had not seen Mother in over a year and were "very happy" about not seeing her, and she recommended that Father's visitation be discontinued because it causes "a lot of distress" for the Children. *Id*. at 76-77. The guardian ad litem ("GAL") testified that D.S. Jr. had consistently expressed resistance to ever returning to his Parents. *Id*. at 123. The GAL also recommended that Father's visitation be discontinued and opined that placing the Children with either parent is a threat to their well-being and that termination of parental rights is in the Children's best interests. *Id*. at 124, 129, 131-32. The family case manager recommended that Father's visitation be discontinued and opined that termination was in the Children's best interests. *Id*. at 106-07.

[17] In March 2017, the trial court issued orders terminating Mother's and Father's parental rights, concluding that the Children had been removed from Parents for at least six months under a dispositional decree, DCS established that there is a reasonable probability that the continuation of the parent-child relationship

poses a threat to the Children's well-being, termination is in the Children's best interests, and DCS has a satisfactory plan for the Children's care and treatment. Father's App. Vol. 2 at 20-25.[1] These appeals ensued. Additional findings supporting the termination orders will be provided.

## Discussion and Decision

[18] In appeals involving the termination of parental rights, we have long employed a highly deferential standard of review. *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92 (Ind. Ct. App. 2014).

> When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. We consider only the evidence and reasonable inferences that are most favorable to the judgment. …. When reviewing findings of fact and conclusions of law entered in a case involving a termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. We will set aside the trial court's judgment only if it is clearly erroneous. A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment.

*In re G.Y.*, 904 N.E.2d 1257, 1260 (Ind. 2009) (citations, quotation marks, and brackets omitted). Here, neither Parent challenges the trial court's findings of fact, and therefore we will accept them as true. *See McMaster v. McMaster*, 681

---

[1] We note that the trial court entered separate termination orders regarding each child. However, because the trial court's findings of fact and conclusions thereon in each order are essentially identical, we cite to the order regarding D.S. Jr.

N.E.2d 744, 747 (Ind. Ct. App. 1997) ("Father does not challenge these findings and we accept them as true."). Therefore, if the unchallenged findings support the judgment, we will affirm. *Kitchell v. Franklin*, 26 N.E.3d 1050, 1059 (Ind. Ct. App. 2015) (affirming where unchallenged findings supported trial court's judgment), *trans. denied*.

[19] We observe that "although parental rights are of a constitutional dimension, the law provides for the termination of these rights when the parents are unable or unwilling to meet their parental responsibilities." *In re A.P.*, 882 N.E.2d 799, 805 (Ind. Ct. App. 2008). Involuntary termination of parental rights is the most extreme sanction, and therefore "termination is intended as a last resort, available only when all other reasonable efforts have failed." *Id.*

[20] A petition to terminate a parent-child relationship involving a CHINS must allege, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services.

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).

DCS must prove by "clear and convincing evidence" each element set forth in Section 31-35-2-4(b)(2). *G.Y.*, 904 N.E.2d at 1261; Ind. Code § 31-37-14-2. "'Clear and convincing evidence need not reveal that the continued custody of the parents is wholly inadequate for the child's very survival.'" *G.Y.*, 904 N.E.2d at 1261 (quoting *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 148 (Ind. 2005)). "'Rather, it is sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody.'" *Id.* (quoting *Bester*, 839 N.E.2d at 148).

Here, Mother and Father challenge the sufficiency of the evidence supporting Section 31-35-2-4(b)(2)(B). We note that subparagraph (B) is written in the disjunctive and therefore requires the trial court to find that only one of the alternatives is supported by clear and convincing evidence. *In re Termination of Parent-Child Relationship of L.V.N.*, 799 N.E.2d 63, 69 (Ind. Ct. App. 2003). Because we conclude that clear and convincing evidence supports the trial court's conclusion regarding (B)(ii), we need not address Parents' challenges to (B)(i). Father also challenges the sufficiency of the evidence supporting Section 31-35-2-4(b)(2)(C).

## Section 1 - The trial court did not clearly err in concluding that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the Children's well-being.

[23] Mother's and Father's arguments regarding whether the parent-child relationship poses a threat to the Children's well-being are very similar. Mother argues that her participation in services and cooperation with the home-based therapist demonstrate that she no longer poses a threat to the Children's well-being. She also points out that she has maintained a stable residence, reunited with Father, who is employed, and even though her visitation was suspended, he has been visiting with the Children regularly. Father contends that he has appropriate housing, is gainfully employed, and although he missed or was late for approximately half his visitations, his visits with the Children have gone very well.

[24] As previously noted, neither party challenges the trial court's findings. Regarding Mother, the trial court made findings related to her participation in services, her drug use, her failure to address her mental health issues, and her flawed understanding of the parent-child relationship. Specifically, the trial court found that "it would be difficult to overstate the lack of interest Mother displayed in complying with [the dispositional] decree" and "her lack of compliance was active and intentional." Father's App. Vol. 2 at 21-22. The trial court found that Mother has a substance abuse issue and that although she met with the addictions coordinator to undergo a substance abuse assessment, the meeting was unproductive and Mother never attended any further meetings

or sought any other treatment for her substance abuse issues. *Id*. at 22. The trial court further found that she continues to use cocaine, justifies her use as "natural," and "categorically refused to submit to drug screens." *Id*. The trial court found that Mother's continued cocaine abuse was an obvious concern for her ability to care for the Children, and that her "failure to see them as people, not property, is of even greater concern and poses an obvious threat." *Id*. at 23. It further found that Mother's mental health poses a threat because she suffers from bipolar disorder, made disturbing allegations about DCS being the "devil" and "evil," and "had not been medication compliant for many years." *Id*.

[25] As to Father, the trial court found that Father appears to enable Mother's behavior, and specifically found that at the termination hearing, Father minimized Mother's mental health issues and "incredibly stated a lack of awareness of Mother's cocaine abuse—a disturbing denial given how openly Mother abuses the substance." *Id*. at 24. The trial court also found that Father has a "significantly elevated lack of empathy for the Children," and "likely sees his children as an emotional support for him, rather than supporting them." *Id*. Most significantly, the trial court recognized D.S. Jr's "profound fear" of being reunited with his parents and found that the Children's behavior was markedly different following visitation in that they were aggressive and irritable. *Id*. The trial court found that "Father makes comments to D.S., Jr. that would distress anyone, much less a child, e. g., 'If I had a stick I would hit you with it,' and 'You're going to go to hell.'" *Id*. These findings support the conclusion with

respect to both Mother and Father that there is a reasonable probability that the parent-child relationship poses a threat to the Children's well-being.

## Section 2 – The trial court did not clearly err in concluding that termination of Father's parental rights is in the Children's best interests.

[26] Father separately challenges the trial court's conclusion that termination of the parent-child relationship is in the Children's best interests.

> [I]n determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the Department of Child Services and to consider the totality of the evidence. In so doing, the trial court must subordinate the interests of the parent to those of the child. The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. Moreover, we have previously held that the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests.

*In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009) (citations omitted); *see also In re L.S.*, 717 N.E.2d 204, 210 (Ind. Ct. App. 1999) ("[C]hildren should not be compelled to suffer emotional injury, psychological adjustments, and instability to preserve parental rights."), *trans. denied* (2000), *cert. denied* (2002).

[27] Father argues that his case is like *In re V.A.*, 51 N.E.3d 1140 (Ind. 2016), in which our supreme court concluded that termination of the father's parental rights was not in the child's best interests. *Id.* at 1153. There, the mother

requested DCS's help because she felt overwhelmed in caring for V.A. and wanted her removal. DCS involvement revealed that the mother had an untreated schizoaffective disorder. The father did not want V.A. removed and "complied" with all court-ordered services and the safety plan that DCS put in place so V.A. would be safe when with mother. *Id*. at 1152. V.A. lived with both mother and father for a month, but DCS thought that mother was not capable of caring for V.A. *Id*. at 1147. DCS told the father that if he did not decide to live without mother, DCS would attempt to remove V.A. from his custody and place her in foster care. *Id*. Our supreme court concluded that "[f]ather's unwillingness to live separately from a mentally ill spouse, without more, is an insufficient basis upon which to terminate his parental rights." *Id*.

[28]  In addition, our supreme court found inadequate the trial court's basis for concluding that termination was in V.A.'s best interests. The trial court had concluded that termination was in V.A.'s best interests so that she could be "freed for adoption." *Id*. at 1152. The *V.A.* court explained that under the circumstances, being freed for adoption was not in V.A.'s best interests:

> [I]t is clear that at the time of the termination hearing, DCS has not yet found an adoptive home for V.A. Consequently, it cannot be the case that relegating V.A. as a permanent ward of the State for an undetermined period of time until a special needs adoptive placement is identified clearly and convincingly shows that termination is in V.A.'s best interests by establishing permanency.
>
> [T]he goal of permanency may best be served by allowing V.A. to remain with her current foster family while DCS pursues the goal

of reunification with Father as he receives the appropriate services that enable him to better understand how to parent his child while simultaneously caring for his mentally ill wife. This is particularly so considering *Father has maintained an appropriate relationship with his daughter* throughout the CHINS proceedings, provided for her throughout the foster care placement, maintained consistent employment, acquired suitable housing, *complied with the requirements that DCS mandated for him in the Parent Participation Plan*, and *has already taken steps to understand how to better care for Mother's mental health needs*.

*Id*. at 1152-53 (emphases added) (footnotes omitted).

[29] Here, although it is true that Mother suffers from a mental illness and DCS has not yet identified pre-adoptive parents for the Children, the similarities between this case and *V.A.* end. Father's relationship with the Children is not appropriate, he has not complied with the requirements in the dispositional decree, he was not even aware of Mother's cocaine use, and he does not recognize the seriousness of Mother's mental illness. We observe that the trial court's conclusion that termination is in the Children's best interests is not based solely on a need for permanency. The trial court found that "Father did display some positive traits" but "has proven either unable or unwilling to address his own shortcomings, and more significantly, continues to enable Mother's." Father's App. Vol. 2 at 25. As discussed earlier, Father failed to consistently participate in and benefit from services. *See In re T.F.*, 743 N.E.2d 766, 776 (Ind. Ct. App. 2001) (parents' failure to demonstrate ability to effectively use recommended services was significant factor in establishing that termination was in child's best interests), *trans. denied*. The trial court also

found that "the Children themselves have been the best evidence of their interests, having greatly improved their behavior now that they have been exposed to routines and stability," and "the Children have now learned basic life skills they should have learned long ago—regularly bathing and attending school, for example." Father's App. Vol. 2 at 25. Father failed to attend approximately half the visits with his Children in the four months preceding the termination hearing, he made inappropriate statements to the Children during visitation, D.S. Jr. consistently demonstrated that he was opposed to visitation, and the Children's behavior was aggressive after visitation. The Children's therapist, the GAL, and the family case manager all recommended that Father's visitation be discontinued. We further note that the GAL and the case manager both opined that termination of parental rights is in the Children's best interest. We conclude that the trial court did not clearly err in concluding that termination of Father's parental rights is in the Children's best interests.

[30] Based on the foregoing, we affirm the trial court's termination of Mother's and Father's parental rights to the Children.

[31] Affirmed.

Vaidik, C.J., and Mathias, J., concur.