## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 31 2018, 11:13 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Daniel G. Foote
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Evan Matthew Comer
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Involuntary Termination of the Parent-Child Relationship of C.B. (Minor Child) and <br><br> W.B. (Mother), <br> *Appellant-Respondent,* <br><br> v. <br><br> The Indiana Department of Child Services, <br> *Appellee-Petitioner* | January 31, 2018 <br><br> Court of Appeals Case No. 49A02-1708-JT-1928 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Marilyn A. Moores, Judge <br><br> The Honorable Larry E. Bradley, Magistrate <br><br> Trial Court Cause No. 49D09-1702-JT-224 |

**Crone, Judge.**

## Case Summary

[1]     W.B. ("Mother") appeals the trial court's order involuntarily terminating her parental rights to her minor child, C.B.  We affirm.

## Facts and Procedural History

[2]     A termination of parental rights hearing was held on August 2, 2017, and the trial court found the following relevant facts:[1]

> 1.  Mother is the mother of C.B., a minor child born on February 28, 2009.
>
> 2.  Four alleged fathers have been named for C.B.  All four have previously had their parental rights terminated.
>
> 3.  A Child in Need of Services Petition "CHINS" was filed [by the Marion County Department of Child Services ("DCS")] on C.B. on March 4, 2015, under Cause Number 49D091503JC000707, after [Mother became] incarcerated.
>
> 4.  C.B. was ordered detained and placed outside the home at the March 4, 2015, initial hearing.
>
> 5.  On April 23, 2015, C.B. was found to be in need of services after Mother filed an admission.  The Court proceeded to disposition on that date.
>
> 6.  C.B. had been removed from [Mother] for at least six (6) months under a disposition decree prior to this termination action being filed on February 20, 2017.

---

[1] We note that the trial court refers to the parties by their full names.  We use "Mother" and the minor child's initials where appropriate.

7.  Disposition was modified on June 25, 2015, upon Mother's release from incarceration, and services were ordered and referred.

8.  Home based case management was referred to address housing and income needs, obtaining a GED, and accessing community resources.  This referral was unsuccessfully closed in June of 2016.  Another referral was offered in July of 2016, but Mother declined.

9.  At the time of trial in this matter, Mother was employed at night cleaning offices.

10.  Mother had unstable housing during the CHINS case.  At the time of trial in this matter, she was living with her mother and sister in a two-bedroom home with a basement, but was not on the lease.  Mother and her mother have had periods where their relationship has been strained.  The maternal grandmother also has [a DCS] history.

11.  Mother underwent a substance abuse assessment after testing positive for cocaine.

12.  Mother was inconsistent in participating in random drug screens, and has not provided a screen since June of 2016.

13.  Mother has a history of alcohol and substance abuse, beginning at age twelve.

14.  In a 2005 CHINS case, Mother's visitation was suspended pending the submission of three consecutive clean drug screens.  That CHINS case was closed after Mother signed adoption consents in a termination of parental rights case.

15.  In a CHINS case regarding C.B. in 2010, Mother was ordered to participate in an aftercare rehabilitation program.

16. In 2015, Mother pleaded guilty to Possession of a Narcotic Drug.

17. Home based therapy commenced in June of 2015, to deal with trauma and abuse. Goals included correcting thinking errors toward societal standards, learning coping skills to maintain sobriety, and parenting skills.

18. Mother made some progress into the summer of 2016, but was unsuccessfully discharged in September of 2016, after progress worsened, and she "went underground" due to fear of reprisal.

19. Christy Walters, Mother's therapist for fifteen months, felt that Mother made poor choices and was not able to parent twenty-four/seven due to putting her needs first ahead of her child's.

20. Mother did not accomplish goals. In the five stages of change, Mother was still at the first stage of pre-contemplation after fifteen months of therapy.

21. When therapy was closed, Therapist Walters could not recommend C.B. being placed back with his mother.

22. Therapy was offered to Mother by C.B.'s therapist, but was not successful.

23. Due to concerns that Mother may hurt herself, a psychological evaluation was ordered but not referred due to the [DCS's] inability to contact Mother.

24. Parenting time evolved to the point of unsupervised weekends, but again became supervised due to safety concerns reported by Mother.

25. C.B.'s foster mother believes that C.B. was dropped off with

relatives and strangers during unsupervised parenting time.

26. After June of 2016, Mother became less engaged in services which were closed along with parenting time being suspended.

27. Prior to the suspension of parenting time, Mother was offered additional visits through C.B.'s therapist. Mother took advantage of additional visits one time.

28. Mother last [saw] C.B. in October of 2016, and she has not requested parenting time or pictures.

29. Mother failed to contact the [DCS] between October 2016 and May 2017.

30. Mother last attended a CHINS case hearing [] in September of 2016.

31. Mother's last contact with C.B.'s foster mother was in October 2016, at which time Mother told foster mother that she had demons and was not able to care for C.B. Prior to that time, the foster mother provided stories about, and pictures of, C.B.

32. C.B. has been in trauma focused therapy with Jan Wines since March of 2015.

33. When removed from his mother, C.B. was severely delayed academically. At the age of six, he did not know numbers or colors. He had no social skills and problem solved with aggression.

34. C.B. had to repeat kindergarten.

35. C.B. has made great strides in his behavior and is described a as a sweet boy. His aggression after visits with his mother stopped when parenting time stopped.

36. C.B.'s foster mother is an advocate for C.B. who is receiving therapy, tutoring, and has a mentor and specialized education plan.

37. The most important things for C.B. to progress are stability and consistency, which are being provided by his foster mother.

38. Mother failed to attend C.B.'s school meetings.

39. C.B.'s placement is pre-adoptive. He has resided in this placement for one and one-half years and is very bonded with his caregiver and another child in the home.

40. C.B. loved his mother but no longer asks about her. He wishes to remain with his foster mother and move on.

41. On January 19, 2017, C.B.'s plan for permanency changed to adoption, with the Court finding, in part, that C.B. needed stable housing and someone to care for his daily needs, that [M]other had failed to complete any of the court ordered services, that no provider recommended C.B. be reunified with his mother, and that [M]other had not maintained contact with DCS or her lawyer.

….

44. Erin Bray has been the family case manager since October of 2015. She recommends C.B. be adopted due to lack of contact with [M]other and her lack of engagement, and it would be in his best interests to remain in the environment where he is flourishing.

45. C.B.'s therapist during the duration of the CHINS case recommends he remain where he is, and to not do so would be emotionally devastating.

46. Based on C.B.'s wishes, []and [M]other's lack of

participation, visits, and skills, Guardian ad Litem Nichole Lee recommends the plan of adoption as being in C.B.'s best interests.

Appellant's App. Vol. 2 at 13-15.

[3] Based upon these findings of fact, the trial court concluded that: (1) there is a reasonable probability that the conditions that resulted in C.B.'s removal and continued placement outside the home will not be remedied by Mother; (2) there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of C.B.; (3) termination of the parent-child relationship between Mother and C.B. is in C.B.'s best interests; and (4) DCS has a satisfactory plan for the care and treatment of C.B., which is adoption. Accordingly, the trial court determined that DCS had proven the allegations of the petition to terminate parental rights by clear and convincing evidence and therefore terminated Mother's parental rights. This appeal ensued.

## Discussion and Decision

[4] "The purpose of terminating parental rights is not to punish the parents but, instead, to protect their children. Thus, although parental rights are of a constitutional dimension, the law provides for the termination of these rights when the parents are unable or unwilling to meet their parental responsibilities." *In re A.P.*, 882 N.E.2d 799, 805 (Ind. Ct. App. 2008) (citation omitted). "[T]ermination is intended as a last resort, available only when all

other reasonable efforts have failed." *Id.* A petition for the involuntary termination of parental rights must allege in pertinent part:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove "each and every element" by clear and convincing evidence. *In re G.Y.*, 904 N.E.2d 1257, 1261 (Ind. 2009); Ind. Code § 31-37-14-2. If the trial court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[5] "We have long had a highly deferential standard of review in cases involving the termination of parental rights." *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92 (Ind. Ct. App. 2014).

We neither reweigh evidence nor assess witness credibility. We consider only the evidence and reasonable inferences favorable to the trial court's judgment. Where the trial court enters findings of fact and conclusions thereon, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings and then determine whether the findings support the judgment. In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous.

*Id.* at 92-93 (citations omitted). "A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *In re R.J.*, 829 N.E.2d 1032, 1035 (Ind. Ct. App. 2005).

[6] Mother challenges the sufficiency of the evidence supporting the trial court's conclusions that there is a reasonable probability that the conditions that resulted in C.B.'s removal from and continued placement outside the home will not be remedied, that termination of Mother's parental rights is in C.B.'s best interests, and that adoption is a satisfactory plan for the care and treatment of C.B. We address these assertions in turn.

## Section 1 – Sufficient evidence supports the trial court's conclusion that there is a reasonable probability of unchanged conditions.

[7] Mother contends that DCS failed to present clear and convincing evidence that there is a reasonable probability that the conditions that led to C.B.'s removal

and continued placement outside the home will not be remedied.[2] In determining whether there is a reasonable probability that the conditions that led to a child's removal and continued placement outside the home will not be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, "we must ascertain what conditions led to [his or her] placement and retention in foster care." *Id.* Second, "we 'determine whether there is a reasonable probability that those conditions will not be remedied.'" *Id.* (quoting *In re I.A.*, 934 N.E.2d 1132, 1134 (Ind. 2010) (citing *In re A.A.C.*, 682 N.E.2d 542, 544 (Ind. Ct. App. 1997))). In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions, and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (quoting *K.T.K.*, 989 N.E.2d at 1231). "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *Lang v. Starke Cty. Office of Family*

---

[2] Mother also argues that DCS failed to prove that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of C.B. However, Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, such that, to properly effectuate the termination of parental rights, the trial court need only find that one of the three requirements of that subsection has been established by clear and convincing evidence. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*. Accordingly, we will address the sufficiency of the evidence regarding only one of the three requirements.

*& Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. The evidence presented by DCS "need not rule out all possibilities of change; rather, DCS need establish only that there is a reasonable probability that the parent's behavior will not change." *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

[8] The record indicates that C.B. was initially removed from Mother's home on an emergency basis "due to allegations of abuse and/or neglect" after Mother's arrest. Appellant's App. Vol. 2 at 17. Specifically, Mother was arrested and charged with level 2 felony dealing in a narcotic drug, level 5 felony possession of cocaine, level 5 felony possession of a narcotic drug, level 5 felony neglect of a dependent, class A misdemeanor possession of a narcotic drug, and class A misdemeanor possession of marijuana. Thereafter, Mother admitted that C.B. was a CHINS and that she was unable to care for him due to her incarceration. Mother ultimately pled guilty to level 6 felony possession of a narcotic drug and was sentenced to 730 days' imprisonment with 540 days suspended. Following Mother's release in June 2015, she was ordered to participate in various services including home-based therapy, home-based case management, a substance abuse assessment, random drug screens, and supervised visitation with C.B. Some of the goals included correcting Mother's thinking errors regarding acceptable societal standards, helping her develop coping skills to achieve and maintain sobriety, and helping her develop parenting skills. Mother was working as an exotic dancer, and the home-based management team was interested in addressing Mother's income needs and helping her obtain a GED

in order for her to get into a different field of work. Home-based case management was also directed at addressing Mother's unstable housing.

[9] While Mother initially participated in some services and made some progress, she was unsuccessfully discharged from services after she regressed significantly. Mother abandoned her visitation with C.B. and subsequently "went underground," ceasing all contact with service providers and C.B.'s foster mother. *Id*. at 14.[3] Mother's therapist of fifteen months testified that, when she last saw Mother for home-based therapy, Mother could not be a full-time parent because Mother was still unable to put C.B.'s needs before her own. Moreover, despite DCS's attempt to treat and monitor Mother's admitted substance abuse issues after she tested positive for cocaine during a random drug screen, Mother has refused to submit to any drug screens since June 2016.

[10] On appeal, Mother simply claims that because she is no longer incarcerated, the conditions that resulted in C.B.'s removal have been remedied. However, Mother ignores the conditions that led to C.B.'s continued placement outside of her care, which include her clear pattern of unwillingness to deal with her parenting problems and substance abuse and to cooperate with those providing services. This evidence regarding Mother's habitual patterns of conduct supports a finding that there exists no reasonable probability that conditions will change. Sufficient evidence supports the trial court's conclusion that there

---

[3] Mother was permitted unsupervised visitation with C.B. for a period of time; however, visitation was ordered supervised again prior to Mother voluntarily ceasing all visitation.

is a reasonable probability that the conditions that led to C.B.'s removal and continued placement outside Mother's care will not be remedied.

## Section 2 – Sufficient evidence supports the trial court's conclusion that termination of Mother's parental rights is in C.B.'s best interests.

[11] Mother next asserts that the evidence does not support the trial court's conclusion that termination of her parental rights is in C.B.'s best interests. In considering whether termination of parental rights is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and look to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In doing so, the trial court must subordinate the interests of the parent to those of the child involved. *Id*. The trial court need not wait until the child is irreversibly harmed before terminating parental rights. *Id*. The testimony of service providers may support a finding that termination is in the child's best interests. *Id*.

[12] Here, Family Case Manager Erin Bray testified that despite DCS's consistent efforts in providing numerous services to Mother, Mother inconsistently participated in only some services and then eventually ceased all contact with DCS for more than eight months. Bray was troubled by the fact that not only had Mother not seen C.B. for an extended period prior to the termination hearing, but she had not even requested visitation with C.B. Bray opined that continuation of Mother's parental relationship would just mean "more instability, more uncertainty, [and] more un-trust" for C.B. and that it was in

his best interests for Mother's rights to be terminated so that C.B. could "remain in an environment where he has begun to flourish." Tr. Vol. 2. at 119.

[13] Likewise, Guardian Ad Litem Nichole Lee opined that termination of Mother's parental rights is in C.B.'s best interests. Lee noted that Mother had not continuously engaged in court-ordered services and had not visited C.B. since October 2016. She opined that C.B. now needs "stability and permanency. He needs to know where he's going to be forever." *Id*. at 155. The record indicates that C.B. was exposed to criminal activity and violence while with Mother and that he had suffered significant trauma as a result. Lee stated that since being outside of Mother's care, C.B. had made great strides "therapeutically." *Id*. at 154. She stated that C.B. "has been in his current placement for around a year and a half. He's happy, he's healthy, he's stable … he has support, stability. He's able to continue in his current school … this is what [C.B.] wants." *Id.* As noted above, the trial court need not wait until a child is irreversibly harmed before terminating parental rights. *McBride*, 798 N.E.2d at 203. Sufficient evidence supports the trial court's conclusion that termination of Mother's parental rights is in C.B.'s best interests.

## Section 3 – Sufficient evidence supports the trial court's conclusion that DCS has a satisfactory plan for the care and treatment of C.B.

[14] Finally, Mother asserts that DCS failed to present clear and convincing evidence that it has a satisfactory plan for the care and treatment of C.B. While the trial court must find that there is a satisfactory plan for the care and

treatment of the child, "[t]his plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." *In re S.L.H.S.*, 885 N.E.2d 603, 618 (Ind. Ct. App. 2008). Generally, adoption is a satisfactory plan. *Id.*

[15] Mother concedes that adoption by C.B.'s current foster mother is the plan in this case, but she argues that such plan is somehow unsatisfactory simply because she does not wish to have her parental rights terminated. Mother's argument misses the mark, and we have already addressed the evidence supporting the termination of her rights above. C.B. has been in the same pre-adoptive foster home for a year and a half, and the evidence indicates that he is happy, flourishing, and very bonded with his foster mother and brothers. Clear and convincing evidence supports the trial court's conclusion that adoption is a satisfactory plan for the care and treatment of C.B. moving forward.

[16] In sum, DCS presented sufficient evidence to support the trial court's termination of Mother's parental rights to C.B. Accordingly, the trial court's termination order is affirmed.

[17] Affirmed.

Robb, J., and Bradford, J., concur.