## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 15 2019, 10:59 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT C.B.

Mark Small
Indianapolis, Indiana

ATTORNEY FOR APPELLANT J.F.

Cara Schaefer Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Sierra A. Murray
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Involuntary Termination of the Parent-Child Relationship of B.F., Je.F., Jay.F., Jar.F., C.F., Ky.F., and Ke.F. (Minor Children) | March 15, 2019 |
| | Court of Appeals Case No. 18A-JT-1967 |
| and | Appeal from the Vigo Circuit Court |
| | The Honorable Sarah K. Mullican, Judge |
| C.B. (Mother) and J.F. (Father), | The Honorable Daniel W. Kelly, Magistrate |
| *Appellants-Respondents*, | Trial Court Cause Nos. 84C01-1710-JT-1441, -1442, -1443, -1444, -1445, -1446, -1447 |

v.

Indiana Department of Child
Services,

*Appellee-Petitioner*

**Crone, Judge.**

# Case Summary

[1] C.B. ("Mother") appeals the involuntary termination of her parental rights to seven of her minor children, and J.F. ("Father") appeals the involuntary termination of his parental rights to six of those children.[1] We affirm.

# Facts and Procedural History

[2] Mother and Father (collectively "Parents") are the biological parents of Je.F. (born October 14, 2008), Jay.F. (born December 18, 2009), Jar.F. (born November 20, 2010), C.F. (born February 3, 2012), Ky.F. (born February 20, 2013), and Ke.F. (born May 15, 2015), and Mother is the biological parent of B.F. (born March 28, 2002) (collectively "the Children").[2] In April 2015, the Indiana Department of Child Services ("DCS") received a report alleging

---

[1] Mother has three children from a prior relationship, C.F., A.F., and B.F. C.F. and A.F. were no longer minors at the time of the termination proceedings so they are not involved. Although B.F. is part of Mother's appeal, because B.F. is not Father's biological child, she is not part of his appeal.

[2] Prior to the termination hearing, Mother gave birth to her tenth and eleventh children, M.F. and P.F. Those two children are not parties to these termination actions.

physical abuse and medical neglect of the Children by Parents. DCS determined that Je.F. had suffered bruising due to inappropriate physical discipline and that several of the Children had unaddressed medical issues. Accordingly, DCS filed child in need of services ("CHINS") petitions as to the Children on June 3, 2015.[3] Following a hearing, the trial court adjudicated the Children as CHINS pursuant to stipulation of the parties. The Children remained in the home; however, the trial court issued dispositional decrees ordering both Mother and Father to participate in various home-based and individual services.

[3] DCS continued to receive reports of physical abuse and domestic violence in the home. DCS was able to substantiate reports that Father kicked three-month-old Ke.F. and threw her out of her infant seat. DCS was also able to substantiate that Father threw Je.F. into a dresser, which resulted in bruising and a "goose egg" bump on his head. Mother's App. Vol. 2 at 51.[4] DCS implemented intensive services and made a safety plan to try to keep the Children in the home. However, in January 2016, after B.F. was "hit in the mouth" and Ja.F. sustained "suspicious injuries," DCS determined that it was "no longer able to ensure the safety of the [C]hildren if left in the home." *Id.* at

---

[3] Ke.F. had just been born. She was added to the proceedings in September 2015 after Father kicked and threw her in front of some of the other Children.

[4] Mother denied that abuse was occurring and claimed that injuries occurred when Je.F. was "rough housing" with one of the other boys. Tr. Vol. 2. at 15. However, some of the older Children witnessed Father abuse Je.F.

52; Tr. Vol. 2 at 13. Accordingly, the Children were removed from Parents' care on January 11, 2016.[5]

[4] Parents were largely compliant with services, and an in-home trial visit was granted in February 2017. However, Parents' volatile relationship continued to be an issue, the Children's behavior quickly regressed, and DCS received new reports of physical abuse and medical neglect. Specifically, Je.F. had a cut on his face, and C.F. had a blackeye and marks on her buttocks consistent with physical abuse. C.F. also had a "popped MERSA boil" that needed, but was not getting, medical attention. Tr. Vol. 2. at 241. The Children were again removed from Parents' care in May 2017.

[5] After virtually no progress was made by Parents in services over the next year, termination petitions were filed, and following a hearing held on July 23 and 24, 2018, the trial court found and concluded in relevant part as follows:[6]

> 17. There is a reasonable probability that the conditions that resulted in the [Children's] removal or the reasons for placement outside the home of the [P]arents will not be remedied, and there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the [Children], as more particularly described below.

---

[5] Although originally placed in foster care, due to behavioral issues, B.F. was moved to respite care, then to a behavioral center, then to shelter care, and eventually to a long-term care group home.

[6] At times, the trial court refers to the parties by their names. We use "Mother," "Father," and "the Children" where appropriate.

A.  Throughout the life of the [CHINS] proceedings, there has been a pattern whereby Mother engages in services and is largely compliant but fails to implement that which she has been taught through services. Through testing that was done as part of a psychological evaluation, DCS determined that Mother's intellectual functioning is extremely limited.  Her IQ score of 63 on the Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV), places [Mother] in the "extremely low range" of intellectual functioning for her age.  Psychologist Dr. Leah Powell found these results to be an accurate reflection of Mother's current level of cognitive functioning.  Dr. Powell also found that Mother appeared to be sad most of the time. She reported feeling generally unlucky.  She also felt a need to "protect" her children, rather than allowing them the independence necessary to become autonomous.

B.  When DCS became involved with the family in 2015, all the children six years old and under were still in diapers and non-verbal.  The court concludes from the evidence that the Children's inability to speak was the result of a combination of untreated hearing loss, cognitive impairment and lack of verbal and intellectual stimulation in the home.  When Mother worked outside the home, Father was the primary caregiver for all [] of the children.  He was described by virtually every witness who interacted with him as extremely quiet and frequently sullen. Poor anger management also appears to be a strong aspect of his personality, as he would frequently abuse Mother and various children in the home.  Whether it was due to Mother's own limited intellectual functioning, a consequence of being a victim of abuse, her dependence on his help with the Children or a combination of these factors, Mother refused to leave Father, and by the time of the termination hearing was denying that he was abusive to her or the Children, claiming that DCS put the notion of abuse in the Children's heads.  Therefore, in addition to concerns about her cognitive functioning making it difficult to parent a large number of children in the home and to deal effectively with the Children's numerous medical and

educational needs, the evidence indicates that Mother cannot keep the Children safe from physical abuse and domestic violence.

C.   Despite the continuing threat that Father's presence in the home posed to all of the Children, Father was generally non-communicative, non-participatory in services, and quick to angry outbursts.  Father refused to talk to DCS case managers, telling at least one of them that they need to communicate with him through Mother.  In family team meetings, [the Parents] would often get so angry that DCS was unable to conduct the meeting.

D.   Mother would often show up to supervised visits crying, having been in a fight with Father.  Their poor relationship, characterized by frequent arguing and physical altercations, remained a significant obstacle to reunification throughout the duration of the case.  When the kids were home on a trial home visit, the Children saw Father grab Mother by the shirt and throw her against a wall.  Mother rationalized Father's abuse, saying that he hits her because she doesn't give him enough breaks with the kids and he takes his frustration out on her.

E.   Although service providers pushed Father to obtain a driver's license so that he could help Mother transport the Children to their many doctor and therapy appointments, he has still never obtained a driver's license.  His intellectual functioning is in the low-average range.  Although he would feed the Children and change diapers during supervised visits, he rarely displayed affection toward the Children.

….

G.   Eighteen-year-old A.F. credibly testified to daily abuse of the Children by her stepfather.  She also frequently saw him abuse her mother.  When the Children were in the care of Father, they would sometimes miss meals and she felt generally unsafe.  She strongly believes that parental rights should be terminated.  ….

H. As a consequence of their education and medical needs,[7] all of the Children at issue require more care than typical children, but due to [the Parents'] limitations and the sheer number of children involved, as well as transportation issues, the [P]arents simply cannot meet those needs for the Children. ….

I. After extensive services for nearly three years, the in-home caseworker from Raintree Consulting, who worked on parenting, tutoring, supervised visitation, home organization and linked the family to resources, felt that no progress had been made with Mother and Father. She testified that the Children made progress following removal on their ability to speak, using the bathroom, etc.

….

18. Based upon all the evidence presented, including recommendations by DCS and CASA [(Court Appointed Special Advocate)], the court finds that termination is in the best interests of all of the [Children].

19. There is a satisfactory plan for the care and treatment of the Children which is adoption. The Children appear to be happy and well-bonded in their pre-adoptive homes.

Mother's App. Vol. 2 at 53-56. Accordingly, the trial court entered its order terminating both Mother's and Father's parental rights to the Children. Each parent now separately appeals.

---

[7] The six younger children (except for Ke.F. who was too young for assessment) each have different and various special needs, including cognitive and developmental delays, post-traumatic stress disorder, reattachment disorder, and hearing loss. Father's App. Vol. 2 at 48-49.

# Discussion and Decision

[6] "The purpose of terminating parental rights is not to punish the parents but, instead, to protect their children. Thus, although parental rights are of a constitutional dimension, the law provides for the termination of these rights when the parents are unable or unwilling to meet their parental responsibilities." *In re A.P.*, 882 N.E.2d 799, 805 (Ind. Ct. App. 2008) (citation omitted). "[T]ermination is intended as a last resort, available only when all other reasonable efforts have failed." *Id.* A petition for the involuntary termination of parental rights must allege in pertinent part:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove that termination is appropriate by a showing of clear and convincing evidence. *In re V.A.*, 51 N.E.3d 1140, 1144

(Ind. 2016). If the trial court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[7] "We have long had a highly deferential standard of review in cases involving the termination of parental rights." *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92 (Ind. Ct. App. 2014).

> We neither reweigh evidence nor assess witness credibility. We consider only the evidence and reasonable inferences favorable to the trial court's judgment. Where the trial court enters findings of fact and conclusions thereon, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings and then determine whether the findings support the judgment. In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous.

*Id.* at 92-93 (citations omitted). "A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *In re R.J.*, 829 N.E.2d 1032, 1035 (Ind. Ct. App. 2005).

[8] Father challenges the trial court's conclusions that there is a reasonable probability that the conditions that resulted in the Children's removal from and continued placement outside the home will not be remedied by him, and that termination of his parental rights is in the Children's best interests. Mother's sole challenge is to the trial court's conclusion that termination of her parental rights is in the Children's best interests. We will address these challenges in turn.

# Section 1 – Clear and convincing evidence supports the trial court's conclusion that there is a reasonable probability of unchanged conditions.

[9] We first address Father's challenge to the trial court's conclusion that there is a reasonable probability that the conditions that led to the Children's removal and continued placement outside the home will not be remedied by him.[8] In determining whether there is a reasonable probability that the conditions that led to the Children's removal and continued placement outside the home will not be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, "we must ascertain what conditions led to their placement and retention in foster care." *Id.* Second, "we 'determine whether there is a reasonable probability that those conditions will not be remedied.'" *Id.* (quoting *In re I.A.*, 934 N.E.2d 1132, 1134 (Ind. 2010) (citing *In re A.A.C.*, 682 N.E.2d 542, 544 (Ind. Ct. App. 1997))). In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions, and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect

---

[8] Father also challenges the trial court's conclusion that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the Children's well-being. However, Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, such that, to properly effectuate the termination of parental rights, the trial court need only find that one of the three requirements of that subsection has been established by clear and convincing evidence. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*. Accordingly, we will address only one of the three requirements.

or deprivation.'" *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (quoting *K.T.K.*, 989 N.E.2d at 1231). "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. The evidence presented by DCS "need not rule out all possibilities of change; rather, DCS need establish only that there is a reasonable probability that the parent's behavior will not change." *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

[10] One of the main reasons the Children were initially removed and continued to be placed outside the home was multiple substantiated reports of Father's physical abuse against the Children. Still, Father asserts that DCS failed to prove that he "had not or would not change" his abusive behavior. Father's Br. at 19. However, the record indicates that Father was wholly noncompliant with the services that were put in place to address the physical abuse. During the termination hearing, DCS Family Case Manager ("FCM") Janet Wall-Myers testified that not only had Father failed to actively participate in services, but he had also "never taken any responsibility for the physical abuse" of the Children. Tr. Vol. 3 at 7. Contrary to Father's contention, FCM Wall-Myers never stated that "she had no concerns" regarding future physical abuse of the Children by Father. Father's Br. at 19. Rather, she acknowledged during the termination hearing that physical abuse was not a current concern simply

because "there are not opportunities" for Father to abuse the Children during supervised visits. Tr. Vol. 3 at 8. DCS presented ample evidence regarding Father's pattern of unwillingness to deal with his abusive behavior and to cooperate with those providing social services. Clear and convincing evidence supports the trial court's conclusion that there is a reasonable probability that the conditions that resulted in the Children's' removal and continued placement outside the home will be not remedied by Father.

## Section 2 – Clear and convincing evidence supports the trial court's conclusion that termination of both Mother's and Father's parental rights is in the Children's best interests.

[11]     Both Mother and Father challenge the trial court's conclusion that termination of their respective parental rights is in the Children's best interests. In considering whether termination of parental rights is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and look to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In doing so, the trial court must subordinate the interests of the parent to those of the child involved. *Id.* The trial court need not wait until the child is irreversibly harmed before terminating parental rights. *Id.* "The historic inability to provide adequate housing, stability, and supervision, coupled with the current inability to provide the same, will support a finding that continuation of the parent-child relationship is contrary to the child's best interests." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). The testimony of service providers may support a

finding that termination is in the child's best interests. *McBride,* 798 N.E.2d at 203.

[12] Here, CASA Mary Canarecci opined that termination of both Parents' rights was in the Children's best interests. She reflected on how this case had "kept [her] awake" at night and how much she "feel[s] for these children." Tr. Vol. 2 at 222-23. She encouraged the trial court "to terminate parental rights so these children can move on." CASA Ex. 1 at 3. She reported that over the past three years of being away from Parents, the Children had "made great progress in development towards a normal lifestyle." *Id*. She further reported that the Children "are experiencing trauma" when forced to visit with Parents and "it is time to move forward" and allow the Children to "leave behind [their] fears[.]" *Id*. She emphasized that Parents had not made any progress in services despite having "all this time to get their act together for these children." Tr. Vol. 2 at 225-26. Canarecci stated that she and her co-CASA were in total agreement in recommending termination of both Mother's and Father's parental rights, and that they did not come to that decision "haphazardly." *Id.* at 226.

[13] Similarly, FCM Wall-Meyers and FCM William Welch each opined that termination of parental rights is in the Children's' best interests. Wall-Meyers noted that although Mother participated in some services, "she struggled to implement changes." *Id*. at 244. Regarding Father, she noted that he "would not actively engage and did not make changes as a result." *Id*. Welch stated that based upon all the reports from service providers, he did not believe that the reasons the Children were removed from Parents' care were likely to be

remedied and that the Children may be "in significant risk of danger and harm" if they were returned home. Tr. Vol. 3 at 52.

[14] Clear and convincing evidence supports the trial court's conclusion that termination of both Mother's and Father's rights is in the Children's best interests. Decisions to terminate parental rights "are among the most difficult our trial courts are called upon to make" and are very fact sensitive. *E.M. v. Ind. Dep't of Child Servs.*, 4 N.E.3d 636, 640 (Ind. 2014). We will not second-guess the trial court's thoughtful decision here.[9] The trial court's termination of Mother's and Father's parental rights is affirmed.

[15] Affirmed.

Vaidik, C.J., and Mathias, J., concur.

---

[9] In its detailed findings and conclusions, the trial court was sympathetic to Mother, noting that this case is "very sad" and although "Mother loves all of her children" and has "invested herself in the court-ordered services," there are "seemingly intractable circumstances" that "render reunification impracticable now and likely in the future as well." Mother's App. Vol. 2 at 50.