# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 31 2019, 8:43 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT T.Y.

Cynthia Phillips Smith
Law Office of Cynthia P. Smith
Lafayette, Indiana

ATTORNEY FOR APPELLANT T.B.Y.

Harold E. Amstutz
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Involuntary Termination of the Parent-Child Relationship of Ta.Y. (Minor Child) <br><br> and <br><br> T.Y. (Mother) and T.B.Y. (Father), <br><br> *Appellants-Respondents,* <br><br> v. <br><br> The Indiana Department of Child Services, <br><br> *Appellee-Petitioner* | May 31, 2019 <br><br> Court of Appeals Case No. 18A-JT-2963 <br><br> Appeal from the Tippecanoe Superior Court <br><br> The Honorable Faith A. Graham, Judge <br><br> Trial Court Cause No. 79D03-1807-JT-116 |

**Crone, Judge.**

# Case Summary

[1] T.Y. ("Mother") and T.B.Y. ("Father") (collectively "Parents") each appeal the trial court's order involuntarily terminating their parental rights to their minor child, Ta.Y. ("Child"). We affirm.

# Facts and Procedural History

[2] Child was born on June 21, 2017, to Parents. In July 2017, Child was removed from the home and placed in protective custody due to allegations of Mother's drug use. Thereafter, the Indiana Department of Child Services ("DCS") filed a child in need of services ("CHINS") petition regarding Child. Following a hearing, the trial court determined that Mother was unable to care for Child due to her admitted methamphetamine use, and the court adjudicated Child a CHINS. A dispositional decree was entered in September 2017, ordering Mother to participate in services. At the time, Father's whereabouts were unknown. However, Father appeared for a hearing in December 2017 and admitted that he was also unable to care for Child. Accordingly, the trial court entered a parental participation decree ordering Father to participate in essentially the same services as Mother.

[3] Parents were eventually unsuccessfully discharged from all services for noncompliance. In July 2018, DCS filed a petition to involuntarily terminate both Mother's and Father's parental rights. Following a termination hearing

held on September 20, 2018, the trial court made the following relevant findings of fact:[1]

> 2. Mother and Father have a history of contacts with [DCS]. Mother and Father have an older child [Ti.Y.] born on June 11, 2011.[2] Neglect was substantiated against Mother and Father regarding [Ti.Y.] in August 2016 after both Mother and [Ti.Y.] tested positive for methamphetamine. At that time, Mother and Father were homeless and without employment. … DCS conducted an assessment in May 2017 related to parental substance use.

> 3. DCS received a report on July 27, 2017, regarding an impaired caregiver at a pediatrician's office after Mother was observed swaying back and forth while holding Child and admitted using methamphetamine prior to the appointment.

> 4. At that time, DCS was able to contact Father by telephone who failed to arrive at the physician's office as promised. During the investigation, Mother was observed swaying, moving all over the place, and making unusual mouth movements while attempting to feed Child despite cues of Child's lack of interest in feeding. Mother admitted relapsing that morning by using methamphetamine and was actively impaired while caring for Child. A drug screen revealed the level of methamphetamine in Child was extremely high. Child tested positive on August 1, 2017 …. On November 2, 2017, Child was still positive for methamphetamine ….

---

[1] For clarity, we substitute the aforementioned "Mother," "Father," "Parents," and "Child" in the trial court's findings where appropriate.

[2] Ti.Y. is not involved in this termination proceeding.

5. …. Child has remained out of [Parents'] care continuously since [September 27, 2017].

….

7. Pursuant to dispositional orders and parental participation decrees issued in the second CHINS case, Mother was offered the following services: mental health assessment, individual therapy, substance abuse assessment and treatment, parenting assessment, home-based case management, random drug screens, and parenting time. Father was offered the same services.

8. A permanency hearing was held on July 19, 2018 at which time the permanent plan was determined to be the initiation of proceedings for termination of parental rights and adoption. Neither parent had yet shown a real investment in reunification. DCS filed its petitions [to terminate parental rights] on July 19, 2018. The evidentiary hearing on the Verified Petitions to Terminate Parental Rights was held on September 11, 2018. At the time of the termination hearing, the circumstances of Parents had not improved. Parents were in no better position to care for Child.

9. Parents have a long-standing history of general instability. Parents were married at the time of Child's birth. The current housing situation of both Parents is unknown…. Both Parents are currently unemployed.

10. Mother was arrested on November 15, 2017 and released. Father was arrested on December 26, 2017 at Mother's home and released. Father has a heart condition and was admitted to the hospital on December 28, 2017 and in January 2018 for approximately one (1) week. Father otherwise has anxiety attacks a couple of times a month that have not required hospitalization.

11. Mother completed a parenting assessment and a mental health assessment. It was recommended that Mother participate in therapy with an addictions specialist to address a history of substance abuse including a relapse prevention plan and focus on healthy relationships as well as case management. Mother was referred to individual therapy in September 2017 and in October 2017 but failed to attend.

12. Commencing in August 2017, Mother participated in case management services at least weekly if not two (2) or three (3) times per week. Mother's goals also included alternate housing as well as addressing substance abuse issues with treatment. During that time, Mother was happy with her housing circumstances residing with Paternal Grandfather. Attempts were made to assist Mother in obtaining inpatient substance abuse treatment without success. Mother was also provided parenting education and was receptive to developmental information and incorporating Child's therapeutic goals during parenting time. Mother ceased attending any services in March 2018.

13. Mother's primary issue is ongoing methamphetamine use. Mother began testing positive for methamphetamine in October 2017 but continuously denied use until March 2018. During the CHINS case, Mother tested positive for amphetamine/methamphetamine on [twelve occasions]. Mother failed to submit to all drug screens as requested.

14. Mother began substance abuse treatment at Sycamore Springs at the end of July 2017. After relapsing, Mother's engagement in services declined. Mother completed a substance abuse assessment in November 2017. Mother reengaged in IOP at Sycamore Springs in January 2018 but ceased attending in favor of IOP at [Wabash Valley Alliance] where she was unsuccessfully discharged after attending only one (1) session.

Mother did not participate in any other substance abuse treatment.

15. Father's primary issue is his mental and physical health as well as ongoing substance use. Father failed to maintain regular contact with DCS. Father failed to complete a substance abuse assessment, mental health assessment, or parenting assessment as ordered.

16. Father participated in case management services in February 2018. Father's goals included obtaining employment and medication management as well as the relationship between the parents. Father failed to make any progress. Father was unsuccessfully discharged in March 2018.

17. Father failed to submit to drug screens as requested. Father tested positive for amphetamine/methamphetamine on July 19, 2018. Father admitted methamphetamine use as recently as a couple of weeks prior to the termination hearing.

18. DCS made early attempts to schedule parenting time for Mother. DCS arrived at Mother's home for a visit in early August 2017 but Mother was under the influence. Between August 2017 and March 2018, Mother was scheduled to attend supervised parenting time. At times, Mother arrived appearing under the influence with dilated pupils although Mother denied any substance use. Mother's visits were suspended on December 28, 2017 as a result of continued drug use. After resuming visits, Mother was unsuccessfully discharged again in March 2018.

19. Father failed to attend any scheduled supervised parenting time sessions. Father's last contact with Child was on July 27, 2017.

20.  Attempts to resume case management services for Parents in late April 2018 were unsuccessful.  When a service provider arrived at the home, Paternal Grandfather led the provider to a dark basement using a flashlight as no light bulbs were working where Parents were asleep in the early afternoon.  The basement was cluttered with trash and food debris.  Paternal Grandfather directed the flashlight into the face of the parents to awaken them with no response.  The service provider reported concerns of an overdose to DCS.  Mother and Father failed to respond to further intake attempts and were discharged unsuccessfully in May 2018.

21.  CASA [court-appointed special advocate] noted that neither parent has made progress toward addressing substance abuse issues.  Neither [Mother nor Father] has regularly maintained contact or participated in services.  Child has remained in the same foster home since removal.  Child is very bonded with the foster family.  The foster parents have provided a stable and nurturing environment which is essentially the only home Child has ever really known.  …. CASA also noted that another CHINS case had been initiated regarding [Ti.Y.] related to the home conditions where Parents resided with Paternal Grandfather and continued substance use by Parents.

Appealed Order at 2-6.

[4]     Based on these findings, the trial court concluded that:  (1) there is a reasonable probability that the conditions that resulted in Child's removal and continued placement outside the home will not be remedied by Mother or Father; (2) there is a reasonable probability that continuation of the parent-child relationship between both Parents and Child poses a threat to Child's well-being; (3) termination of the parent-child relationship between both Parents and Child is in Child's best interests; and (4) DCS has a satisfactory plan for Child's care and

treatment, which is adoption. Accordingly, the trial court determined that DCS had proven the allegations of the petition to terminate by clear and convincing evidence and therefore terminated both Mother's and Father's parental rights. Each parent separately appeals.

# Discussion and Decision

"The purpose of terminating parental rights is not to punish the parents but, instead, to protect their children. Thus, although parental rights are of a constitutional dimension, the law provides for the termination of these rights when the parents are unable or unwilling to meet their parental responsibilities." *In re A.P.*, 882 N.E.2d 799, 805 (Ind. Ct. App. 2008) (citation omitted). "[T]ermination is intended as a last resort, available only when all other reasonable efforts have failed." *Id*. A petition for the involuntary termination of parental rights must allege in pertinent part:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove that termination is appropriate by a showing of clear and convincing evidence. *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016). If the trial court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[6]     "We have long had a highly deferential standard of review in cases involving the termination of parental rights." *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92 (Ind. Ct. App. 2014).

> We neither reweigh evidence nor assess witness credibility. We consider only the evidence and reasonable inferences favorable to the trial court's judgment. Where the trial court enters findings of fact and conclusions thereon, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings and then determine whether the findings support the judgment. In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous.

*Id.* at 92-93 (citations omitted). "A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *In re R.J.*, 829 N.E.2d 1032, 1035 (Ind. Ct. App. 2005).

## Section 1 – Clear and convincing evidence supports the trial court's conclusion that there is a reasonable probability of unchanged conditions.

[7]    Both Parents challenge the trial court's conclusion that there is a reasonable probability that the conditions that resulted in Child's removal from and continued placement outside the home will not be remedied.[3]  In determining whether there is a reasonable probability that the conditions that led to Child's removal and continued placement outside the home will not be remedied, we engage in a two-step analysis.  *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013).  First, "we must ascertain what conditions led to [her] placement and retention in foster care."  *Id*.  Second, "we 'determine whether there is a reasonable probability that those conditions will not be remedied.'"  *Id*. (quoting *In re I.A.*, 934 N.E.2d 1132, 1134 (Ind. 2010) (citing *In re A.A.C.*, 682 N.E.2d 542, 544 (Ind. Ct. App. 1997))).  In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions, and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'"  *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (quoting *K.T.K.*, 989 N.E.2d at 1231).

---

[3] Both Parents also challenge the trial court's conclusion that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to Child's well-being.  However, Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, such that, to properly effectuate the termination of parental rights, the trial court need only find that one of the three requirements of that subsection has been established by clear and convincing evidence.  *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*.  Accordingly, we will address only one of the three requirements.

"A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. The evidence presented by DCS "need not rule out all possibilities of change; rather, DCS need establish only that there is a reasonable probability that the parent's behavior will not change." *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

[8] The record indicates that Child was initially removed from the home due to Mother's drug use and Child testing positive for extremely high levels of methamphetamine. Mother's main goal in court-ordered services was to address her substance abuse, but she made little to no progress on that goal. Tr. Vol. 2 at 17. Mother was referred to substance abuse treatment yet was discharged after attending only one therapy session. Mother continued to test positive for amphetamines and or methamphetamines twelve times during the CHINS case. Despite continually testing positive for methamphetamine, Mother denied any drug use. Service providers observed that Mother was often under the influence of drugs during her supervised visits with Child. Visits with Child were repeatedly suspended due to Mother's continued drug use, and then resumed in hopes of change. However, Mother refused to stop abusing methamphetamines and was unsuccessfully discharged from supervised visitation in March 2018.

[9]     Regarding Father, shortly after Child's removal from the home, DCS located Father, and he admitted that he was also unable to care for Child. It was determined that he struggled with both mental and physical health issues, as well as ongoing substance abuse. DCS attempted to address those issues through various service referrals, but Father failed to maintain contact with DCS. Father failed to complete a substance abuse assessment, a mental health assessment, or a parenting assessment as ordered by the trial court. Father submitted to only two drug screens during the CHINS case, one of which was positive. Father was eventually discharged from home-based case management due to noncompliance, and he failed to attend any supervised visitation with Child, his last contact with Child being in July 2017.

[10]    The record indicates that DCS tried to resume at least some case management services with both Parents in late April 2018. Parents were found living in deplorable conditions in Paternal Grandfather's basement. Attempts to even awaken Parents that day were unsuccessful, with the service provider reporting concerns of a possible drug overdose. Parents failed to respond to any further communications with DCS, and both were unsuccessfully discharged from all services in May 2018.

[11]    Both Parents have failed to cooperate with those providing social services and have demonstrated an unwillingness to address the plethora of issues that led to Child's initial removal and continued placement outside their care. Although Father blames Child's initial removal on Mother, he ignores that he too failed

to participate in court-ordered services or to address his parenting problems, including his claimed mental health issues and his substance abuse.

[12] In addition, both Parents have a longstanding history of "general instability" and, at the time of the termination hearing, both were without stable housing and unemployed. Appealed Order at 3. In sum, Parents' demonstrated pattern of unwillingness to deal with their parenting problems and to cooperate with those providing social services, coupled with unchanged conditions, clearly and convincingly supports the trial court's conclusion that there exists no reasonable probability that the conditions that led to Child's removal and continued placement outside the home will change.

## Section 2 – Clear and convincing evidence supports the trial court's conclusion that termination of both Mother's and Father's parental rights is in Child's best interests.

[13] Both Parents also challenge the trial court's conclusion that termination of their respective parental rights is in Child's best interests. In considering whether termination of parental rights is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and look to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In doing so, the trial court must subordinate the interests of the parent to those of the child involved. *Id*. The trial court need not wait until the child is irreversibly harmed before terminating parental rights. *Id*. "[T]he historic inability to provide adequate housing, stability, and supervision, coupled with the current inability to provide the same, will support a finding

that continuation of the parent-child relationship is contrary to the child's best interests." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). The testimony of service providers may support a finding that termination is in the child's best interests. *McBride,* 798 N.E.2d at 203.

[14] DCS Family Case Manager Ashley Rayburn testified that while Mother initially participated in some services, her participation was minimal and she made little progress. Rayburn stated that Father participated in no services. Rayburn testified that both Parents were unsuccessfully discharged from all services in May 2018 for noncompliance. Rayburn emphasized that Parents appeared unwilling to complete substance abuse treatment and had still not demonstrated that they could maintain a stable home or employment. Accordingly, Rayburn opined that it was in Child's best interests to be adopted into her current foster home.

[15] Similarly, CASA Hunter Merriman testified that neither Mother nor Father had made any progress in addressing their substance abuse issues. Merriman noted that another CHINS case had already been initiated against Parents' regarding their other minor child, Ti.Y., due to deplorable home conditions where Parents were living and their continued substance abuse. Merriman noted that Child had resided in the same foster home since her removal, and that Child was very bonded with the foster family. Merriman opined that termination of both Parents' rights, which would allow for adoption, was in Child's best interests.

The trial court here need not wait until Child is irreversibly harmed before terminating parental rights. *See id.* at 203. Clear and convincing evidence supports the trial court's conclusion that termination of both Mother's and Father's parental rights is in Child's best interests. The trial court's involuntary termination order is affirmed.

Affirmed.

Bradford, J., and Tavitas, J., concur.